THE STATE OF KANSAS v. JAMES W. WELLS.

1. CRIMINAL ACTION — *Private Counsel for State.* It is not error for the court to permit private counsel to assist the county attorney, by his request, in prosecuting a criminal action, and to make the opening statement of the case to the jury.

2. ERRONEOUS INSTRUCTION, *Withdrawal of.* Where an erroneous instruction is included in the written charge of the court, and read to the jury, the court not only has the right, but rests under the duty, to withdraw the erroneous instruction from the consideration of the jury; and where this is done in such a manner that it must necessarily have been clearly understood by the jury, the error in the original draft of the instructions is cured.

3. HOMICIDE — *Failure to Charge as to Lower Degree.* The defendant was charged with murder in the first degree, and convicted of murder

in the second degree. That he killed the deceased by shooting him was conceded. The court correctly defined the crime of murder in the first and second degrees, and of manslaughter in the several degrees, but failed to charge the jury that if they were in doubt in which of two or more degrees the defendant was guilty, they should convict of the lowest degree only. No instruction to this effect was asked by the defendant. The evidence showed that the killing was willful and malicious if it was not justifiable, and did not fairly tend to prove manslaughter in any degree. *Held*, That no error was committed in failing to charge on this point.

4. DEFENDANT *as Witness — Cross-Examination.* A defendant who takes the stand and testifies as a witness in his own behalf may be cross-examined upon matters affecting his character and credibility the same as other winesses; and the facts developed on the cross-examination, even though they incidentally tend to show that the defendant is guilty of other offenses than that for which he is on trial, become proper evidence in the case to be considered by the jury, so far as they tend to prove any issue in the case.

5. DISTRICT COURT— *Lapse of Term — Jurisdiction.* Where a term of the district court at which a criminal case is properly triable lapses without any formal adjournment and without any special order continuing the case till the next term, the court does not thereby lose jurisdiction of the case, but may proceed with the trial at the next regular term.

6. EVIDENCE — *Verdict.* The evidence in the case examined, and *held* sufficient to sustain the verdict.

## Appeal from Ford District Court.

THE defendant was charged with having murdered Loren E. Warren and was convicted of murder in the second degree. It was shown on the trial that the defendant was a keeper of a gambling room in Dodge City. The deceased, Warren, was a bartender. The two parties had passed the night preceding the tragedy in the defendant's gambling room. The defendant commenced drinking about four o'clock in the morning, and drank until he became intoxicated. About nine o'clock he lay down on a table, in a saloon in the basement of the Oriel block, where he slept until somewhere about one o'clock in the afternoon, when the deceased came and woke him up. The two went out of the saloon together, and soon came back, when Warren said to the bartender, "Bel-

mere, some one has 'touched' Jimmie," meaning that some one had taken his money. Warren told Wells that he had the money inside his vest pocket. Wells then ran his hand in his pocket and pulled out his money. The two appear to have been together more or less from that time until the occurrence of the tragedy, the defendant at various times still declaring that he had been robbed. A short time before the tragedy the two were together in the Palace drug store. Wells was still insisting that Warren had his money. Warren said, "No I have n't; I have got $10 that belongs to you." Warren then gave Wells $10. They then left the Palace drug store together. Soon afterward they were together inside an iron railing which incloses a stairway leading into the saloon where the deceased worked, under the Delmonico hotel building. Wells was still claiming that he had been robbed. Warren was trying to persuade him to go down in the basement to talk the matter over. Some of the time Warren had hold of him. Wells said, "Let me go; I want to go home," and called for aid. Warren appears to have been detaining him there inside of the rail. He told Wells if he would come around when he was sober and say he had robbed him, he would made it all right with him or pay him. Warren finally let go of Wells, and he climbed out over the railing. After Wells had started away, he said, "I'll show you whether I'll go home or not." The defendant then went to Zimmerman's hardware store and tried to buy a gun. The proprietor refused to sell one to him. While he was in the store Fitzgerald came in, and the defendant asked him to intercede with the proprietor to help him get a gun, saying, that he believed they had one, but would not sell it to him. He wanted Fitzgerald to say he was all right. This Fitzgerald refused to do, but told Wells that he did not think he was in a fit condition to have a gun. They then talked the matter of the difficulty between Wells and Warren over, Fitzgerald advising the defendant to go home and not have any trouble. During the conversation Wells said, in substance, that if he could get a gun he would "make Warren

fight or hide out." Fitzgerald offered to go home with him, but the defendant did not seem inclined to have him do so.

From the hardware store, which was the next building to the Delmonico hotel, he appears to have gone into Laubner's cigar store, where he asked Laubner for a gun. Laubner refused, saying that he had n't any. The defendant said: "You have got one in the safe." Being asked what he wanted a gun for, he said: "To pawn it." The defendant then went to a second-hand store kept by A. P. Coons in the next block west, where he succeeded in buying a pistol. The defendant also asked for cartridges, and tried to open the gun, but did not seem to understand it. Coons showed him how to open it, and the defendant put the cartridges into it. As the defendant went out the door, Coons noticed that he staggered slightly. The defendant then went back east on Front street to the Delmonico hotel building, and down the stairway leading to the saloon. After a very short time he came back up the stairway, and again started west. Soon afterward the deceased, Warren, came down the street, going east. As they approached each other, several parties called out to Warren to look out; that Wells had a gun. The parties continued walking toward each other. There were a number of persons on the street, and one man seems to have been walking between Wells and Warren, so that Wells did not see Warren until they were within a short distance of each other. When they were very close together, Wells raised his pistol and fired. Warren then rushed on him, threw him down, and choked him. Some of the bystanders took hold of Warren, and pulled him off from Wells. As they did so, Warren said: "Let me alone; I know what I am doing; I am shot." After he was raised up, he kicked Wells in the face. Shortly afterward he sank down on the sidewalk. He was then taken up and carried into one of the neighboring store buildings, where he very soon expired, the ball having penetrated the lower part of the heart. The defendant is shown to be a small man, weighing not much over 100 pounds. The de-

ceased was a large man, weighing over 200. The parties had always been good friends until the day of this occurrence.

*Ed. H. Madison*, *B. F. Milton*, and *J. W. Ady*, for appellant.

*John T. Little*, attorney general, *F. A. Mitchell*, county attorney, for The State; *Sutton & McGarry*, of counsel.

The opinion of the court was delivered by

ALLEN J.: Numerous questions are raised by the appellant, which we will consider in the order in which they are presented in the brief.

I. It appears that the opening statement of the case to the jury was made by W. M. Sutton, who was neither the prosecuting attorney of the county nor his deputy. The defendant objected at the time, and insisted that, under the statute, it was a personal duty resting on the county attorney, which he could not delegate to private counsel. The court overruled the objection, and the opening statement was made by Mr. Sutton; the county attorney, Mr. Mitchell, being present, however, and requesting that Mr. Sutton be allowed to make the opening statement. This question was considered in the case of *The State v. Wilson*, 24 Kas. 189, where Mr. Ady, one of the counsel for the defendant in this case, was employed to assist the county attorney in a prosecution,

1. Criminal action — private counsel for state.

and was paid by the father of the deceased, for whose murder the defendant was tried. It was there held, that it was not error to permit private counsel to assist the public prosecutor. In this case, it appears that the county attorney was personally present, and that Mr. Sutton acted with his consent. We do not think that ¶ 5295 of the General Statutes of 1889 declares any special rule with reference to the opening statement to the jury. The law makes it the duty of the county attorney to conduct criminal prosecutions on behalf of the state, and all steps in the trial are alike under his supervision and control. (See, also, *The State v. Smith*, 50 Kas. 69.)

II. Objection was made to the competency of Barrow and Torline as jurors. The only showing of anything like a fixed impression as to a material fact in the case was disclosed by the examination of Torline, and that was with reference to the fact that Wells had been killed. While the word "murdered" was used by the juror, he evidently did not use it in the legal sense, and stated that he had no opinion as to whether the killing was justifiable or not. As there was no conflict whatever in the evidence with reference to the fact that Warren was killed, nor as to the further fact that the defendant killed him, we do not perceive that the defendant could be prejudiced in any manner by the impression this juror had with reference to it before the trial. We think the case comes within the rule declared in *The State v. Medlicott*, 9 Kas. 257; *The State v. Wells*, 28 id. 321. The facts in this case are not as strong as in the last case cited.

III. It is claimed that a part of the thirty-seventh instruction, as written by the court and read to the jury, was erroneous, and that, having proceeded so far, the court had no power to withdraw it; that the error, having been once made, was irremediable. The record shows that, after the instruction had been given, the court, at the request of counsel for the state, withdrew the objectionable part of it. Check marks were made showing where the part withdrawn commenced, and where it ended, and pencil lines were drawn across the part withdrawn, and the attention of the jury was pointedly called to the portion withdrawn by the court, and the instructions so marked were taken by the jury to their room. There can be no doubt as to the right of the court to modify or withdraw an erroneous instruction at any time before the case is finally submitted to the jury. The very purpose of allowing exceptions to instructions is that the attention of the court may be directed to any part that may be erroneous, and that the court may then and there review and correct the error. This proposition is amply supported in the authorities. ( *Sittig v. Bikestack*, 38 Md. 158; *Jones v. Talbot*, 4 Mo. 279;

2. Erroneous instruction, withdrawal of.

*Hall v. The State*, 8 Ind. 439; *Sage v. Railroad Co.*, 134 id. 100; Thomp. Ch. Jur. § 93.)

It is urged in this connection that the language used by the court at the time this part of the instructions was withdrawn indicated that the court still believed it to be sound, and that the jury might have been influenced by it, notwithstanding its withdrawal, believing that the judge was right in the first instance. We do not perceive any special force in the argument. In all cases where a trial judge gives an erroneous instruction, it is to be presumed that, at the time he wrote it, he thought it was a correct expression of the law, and, in any case where an instruction is withdrawn, it might be argued that because the judge had once asserted that it was a correct proposition of law that it would necessarily have influenced the jury. Juries are presumed to act intelligently, as well as courts; and when the court has withdrawn from their consideration a portion of the instructions, it is to be presumed that they will not give it any weight in their deliberations.

IV. We think the definition of "reasonable doubt" is about as good as is ordinarily given, and the expression that all that can ordinarily be obtained in human affairs is reasonable certainty does not convey an essentially different idea from that of the absence of reasonable doubt.

V. Error is claimed because the court failed to instruct that, if the jury were in doubt in which of two or more degrees of an offense the defendant is guilty, he may be convicted of the lowest degree only. No instruction on this point was asked, and it may well be doubted whether, under the former decisions of this court, a reversal could be had on this ground. (*The State v. Pfefferle*, 36 Kas. 90, 96; *The State v. Peterson*, 38 id. 211; *The State v. Estep*, 44 id. 572.) The defendant was charged with murder in the first degree His defense was that his mind was so affected by intoxicating liquors that he did not know what he was doing, and consequently was incapable of entertaining a purpose in his mind to do any act, and wholly incapable of judging between right

and wrong.   On the witness stand, he testified that he had no recollection whatever of having shot the deceased, and had very little recollection as to what occurred at any time after he awoke in the saloon until his family visited him at the jail, in the evening.   It seems clear that the defendant was guilty of murder, or of no offense punishable by law.   We are unable to find anything in the evidence indicating the commission of manslaughter in any degree.   Instructions should only be with reference to the law applicable to the facts disclosed by the testimony.   The court, however, did instruct fully as to what constitutes the various degrees of manslaughter.

3. Homicide—failure to charge as to lower degree.

The forty-second instruction is criticised, and especially the first part of it.   When read in connection with the one which immediately follows it, we do not perceive that it is open to the criticism urged by counsel, nor that the two instructions as a whole could be at all prejudicial to the defendant.   Ordinarily, it may be better to omit anything like a discussion of general policy, or of the duty of jurors in reference to the enforcement of criminal laws, and of the effect that a verdict may have on the welfare of the body politic, yet we are not prepared to say that it would in all cases be improper for the court to advert to such matters.   We perceive nothing harmful in the language used in this case.

VI.   The scope of the cross-examination of the defendant on the witness stand is complained of.   In the case of *The State v. Pfefferle,* supra, the second and third paragraphs of the syllabus are as follows:

"2.   Where a defendant in a criminal case takes the witness stand to testify in his own behalf, he assumes the character of a witness, and is entitled to the same privileges, and subject to the same tests, and to be contradicted, discredited, or impeached, the same as any other witness.

"3.   The extent to which a witness may be cross-examined on matters irrelevant and collateral to the main issue, with a view of impairing his credibility, depends upon the appearance and conduct of the witness, and all the circumstances of the case, and necessarily rests in the sound discretion of the

trial court; and only where there has been a clear abuse of that discretion will error lie."

Many authorities bearing on the question were carefully reviewed, and are cited in the opinion. (See, also, Rice, Ev., p. 350, note.)

The defendant having testified in his own behalf, counsel for the state on cross-examination asked him with reference to his occupation, his past life, and particular difficulties and quarrels he had had, and with reference to his having carried and used dangerous weapons at other times. It is insisted that such examination was improper, and that it was at least the imperative duty of the court to instruct the jury that the evidence given by the defendant in answer to these questions could be used only for the purpose of affecting his credibility. No such instruction was given. In the case of *People v. Casey*, 72 N. Y. 393, it was said by Earl, J., in delivering the opinion of the court:

"Upon the trial the prisoner was a witness in his own behalf, and it is now complained that the counsel for the people, on cross-examination, was permitted to question him as to other altercations in which he had been engaged and other assaults which he had committed. This complaint is not well founded. When a prisoner offers himself as a witness in his own behalf, he is subject to the same rules upon cross-examination as any other witness. He may be asked questions disclosing his past life and conduct, and thus impairing his credibility. Such questions may tend to show that he has before been guilty of the same crime as that for which he is upon trial, but they are not on that account incompetent. When he offers himself as a witness, and seeks to take the benefit of the statute which authorizes him to testify in his own behalf, he takes the hazard of such questions. He must determine before he offers himself whether his examination will benefit or injure him. The extent to which such an examination may go to test the witness's credibility is largely in the discretion of the trial court." (See, also, *People v. Irving*, 95 N. Y. 541.)

4. Defendant as witness— cross-examination.

VII. The information in this case was filed on the 4th of

September, 1893. The September term of the district court of Ford county commenced on the next day. An application was made for a continuance of the case till the January term, 1894, which was overruled. The court then announced that an adjourned session of the court would be held on the 8th of November, at which time this case would be called for trial. The September term was thereafter adjourned until the 10th of October, which was the regular day for convening court in Hamilton county, in the same district. The court convened in Hamilton county on that day, and a judge *pro tem.* was selected in Ford county, who attempted to adjourn the Ford county term until the 8th day of November, the district judge not being present either in Ford or Hamilton county. On the 8th of November court did not convene in Ford county, and no further order with reference to the case was made after that continuing the trial to that date. A motion was made in the district court to discharge the defendant, on the ground that the court had lost jurisdiction of the case. This motion was overruled, and the trial proceeded at the January term, 1894. We do not think these facts show any loss of jurisdiction. The information was still pending against the defendant. The offense was committed in Ford county. The defendant was in custody. No provision of the statute is called to our attention which could by any construction take away the jurisdiction of the court, and we have no knowledge of any such provision. We suppose the general rule is, that all business remaining undisposed of at the end of a term of court goes over to the next term, whether any formal order to that effect is entered or not.

5. District court —lapse of term —jurisdiction.

VIII. On the oral argument, it was strenuously insisted by counsel that the evidence in this case fails to uphold the verdict; that it is apparent from the testimony of all the witnesses that the defendant was not only drunk, but so drunk that he utterly failed to know what he was doing at the time he killed Warren. This really was the main question passed on by the jury at the trial. That the defendant had been

drinking and was under the influence of liquor at the time of the tragedy cannot be doubted, but this alone does not render him necessarily irresponsible. If he knew the nature of his acts, and could judge between right and wrong, the law holds him responsible to the same extent as though not under the influence of intoxicants. While at the head of the stairs leading into the saloon in the basement of the Delmonico hotel building, he asked the deceased to let him go, claiming that he wished to go home. As soon as he got away from him, he manifested no disposition to go home. On the contrary, he made unsuccessful efforts to get a pistol at two different places. He then went to a store in another block, where he succeeded in buying a pistol and cartridges, and, loading the pistol, instead of going home then, he turned back, and went to the place where he had left the deceased, and where he might reasonably expect to find him, evidently in search of him. After looking in at the door, failing to find him there, he ascended the steps to the sidewalk and started west on the street with the pistol in his hand, evidently looking for the deceased, and on meeting him, after going only a very short distance, he at once raised his pistol and shot Warren through the heart.

If a jury, under these facts, testified to by many witnesses, could have accepted the defendant's statement that he remembered absolutely nothing as to what occurred during that time, it would have been a most unusual exhibition of credulity on their part. It is certainly very difficult to believe, if not absolutely incredible, that the defendant could in so many ways have indicated a settled purpose to take the life of the defendant, and have sought and obtained means to carry that purpose into effect with so much care, and then have hunted and found his victim, and accomplished his purpose, without knowing anything at all about what he was doing. The jury evidently discredited his story, and so do we. And while there are many circumstances showing deliberation and premeditation, thus indicating murder in the first degree, the

6. Evidence—
verdict.

jury have acquitted the defendant as to these elements of criminality, but the facts disclosed by the testimony are still ample to show that the killing was done purposely and maliciously. It may be that the defendant would not have committed the crime if sober, and that in a certain sense the intoxicants which he had taken are the cause of the crime, yet he had taken them of his own volition, and it is universally held that intoxication voluntarily induced is neither an excuse for nor a justification of crime. We perceive no subtantial error in the record, and the judgment is affirmed.

All the Justices concurring.