## *Ex parte* R. A. METCALF.

No. A-1303. Opinion Filed February 8, 1913.

(129 Pac. 675.)

1. **PERJURY—Circumstantial Evidence.** In a prosecution for perjury, the falsity of the defendant's evidence may be established by circumstantial evidence, but the facts constituting such circumstantial evidence must be directly and positively sworn to by at least one credible witness, supported by corroborating evidence, and, taken as a whole, must be of such a conclusive character as to exclude every other reasonable hypothesis, except that of the defendant's guilt.

2. **SAME—Evidence—Admissibility.** In order to constitute perjury, it is not necessary that the false evidence given is material to the main issue in a trial. It is sufficient if it is material to any proper matter of inquiry and is calculated and intended to prop or bolster the testimony of a witness on some material point, or to support or attack the credibility of such a witness.

For sufficient circumstantial evidence to sustain a prosecution for perjury, see opinion.

3.    INTOXICATING LIQUORS—Possession With Intent to Sell.  In prosecutions for illegal possession of intoxicating liquors for the purpose of violating the prohibitory liquor law, it is not necessary to prove that the defendant actually owned the liquors in question.  Proof that the defendant was in possession of such liquors, with the intention of violating the prohibitory liquor law, will sustain a conviction.

4.    PERJURY—Enforcement of Criminal Laws.  It is the duty of prosecuting attorneys and trial judges to be prompt and vigilant in seeing that persons who commit perjury in courts of this state are speedily brought to justice.

(Syllabus by the Court.)

Application by R. A. Metcalf for a writ of *habeas corpus.* Writ discharged.

The nature of the question involved requires a full statement of the case, for there are few, if any, more important matters than the suppression of perjury in the courts of this state.  Relator was prosecuted before Hon. A. L. Squire, county judge of Ellis county, sitting as a committing magistrate, upon the following complaint:

"Before me, A. L. Squire, *ex officio* committing magistrate and county judge in and for said county and state, personally appeared Frank E. Ransdell, who, being duly sworn, says that on or about the 13th day of March, in the year of our Lord one thousand nine hundred and eleven (1911), at and within the county of Ellis and state of Oklahoma, one R. A. Metcalf, late of the county and state aforesaid, did then and there commit the crime of perjury in the manner and form as follows, to wit: That the said R. A. Metcalf in the county of Ellis, state of Oklahoma, on the 13th day of March, 1911, in the county court of Ellis county, Oklahoma, sitting at Gage, Oklahoma, in said county, the said court being otherwise called the Gage division of the county court of said Ellis county, the honorable A. L. Squire, the regularly elected, qualified, and acting judge for said court, then and there presiding and acting, wherein the case of State of Oklahoma v. R. A. Metcalf, charged with the unlawful possession of intoxicating liquors, being No. 9 on said court docket, was then and there being tried and heard before the court aforesaid and a jury, which had been duly selected to try said cause, and the said R. A. Metcalf was then and there produced as a witness in said cause on behalf of the defense, and was then

and there duly sworn to testify truly in said case by A. L. Squire, the judge aforesaid, who was then and there duly authorized and empowered to administer oaths in such cases, and to administer said oath in that case, in manner and form as was then and there done as aforesaid. That then and there the following became material questions in said case, to wit: Whether the said R. A. Metcalf, defendant in said case, owned, had, or was in possession of any whisky or beer in a place known as the 'Yellow Front Restaurant' on the east side of Main street in the town of Gage, Oklahoma, at any time from the 1st day of August, 1910, to the 13th day of March, 1911, and particularly on the 15th day of September, 1910; and whether the said R. A. Metcalf ever had control, owned, or had the management of the said Yellow Front Restaurant or had any interest in the said restaurant or run the same as an employee or otherwise; and whether the said R. A. Metcalf worked around, at, or in said restaurant, or ever received any compensation for working or clerking in said restaurant at any time, and more particularly from August 1, 1910, to March 13, 1911; and whether the said R. A. Metcalf had any knowledge of and concerning a certain partition in the wall or walls of the building known as the Yellow Front Restaurant, or had any knowledge of secret place or places in said wall or walls in which could be secreted beer and whisky or other intoxicating liquors, which, with certain beer and whisky contained in said walls and partitions and secret place, was discovered by G. M. Rader, sheriff of Ellis county, Oklahoma, and other persons, in a search made of said building on or about September 15, 1910, at any time before the same was so discovered on September 15, 1910; and whether the said R. A. Metcalf, at any time prior to the finding of said beer and whisky on said September 15, 1910, by said sheriff, had any knowledge of beer and whisky having been secreted in said walls and partitions of said walls and building or been kept in said walls and partitions of said building; and whether the said R. A. Metcalf knew of any one getting whisky or beer so secreted from said place and out of said walls and partitions at any time from on or about August 1, 1910, to March 13, 1911, or at any time; and whether the said R. A. Metcalf had any knowledge of whisky or beer being secreted or kept or owned in said room or rooms, or any of them, of said building or in said building known as the Yellow Front Restaurant, or had any knowledge of any one going back of the partition running north and south through said building to get whisky or beer at any time; and whether the said R. A. Metcalf, Ed Hickman, Joe Siddens, or James Johnson, or any or either

of them owned, managed, controlled, or run said restaurant during the period of time from on or about August 1, 1910, to March 13, 1911, or during any part of said time; and whether the said R. A. Metcalf ever was paid anything for working in and around said restaurant during said period of time last mentioned, by Ed Hickman or any other person, or ever received any money coming to said restaurant from sales or in the regular course of trade; and whether at the time of said search of said building by the said sheriff, G. M. Rader, after the said sheriff Rader had handed the said R. A. Metcalf the search warrant, the said Metcalf handed the said search warrant back to the said Rader or to one Daniel Rees; and whether the said R. A. Metcalf sold whisky to one John Quillen on or about September 10, 1910; and whether the said R. A. Metcalf sold to said John Quillen one pint of whisky on or about August 17, 1910; and whether the said R. A. Metcalf at any time herein mentioned had had liquor shipped to or consigned to places in Texas, and then brought back to Gage, Oklahoma; and whether a certain United States Revenue License as a retail liquor dealer, otherwise called a government stamp, for the period of time from on or about August, 1910, to July 1, 1911, was obtained by the said R. A. Metcalf, and the tax for the same paid by the said R. A. Metcalf, because the said R. A. Metcalf had been instructed to or advised by the United States Revenue Collector or revenue man, for the district of which Oklahoma is or was a part, to take out said license or stamp and pay said tax; and whether the said license or stamp was used by said R. A. Metcalf in the business of a retail liquor dealer or not; and whether certain liquor, to wit, a cask of whisky, 24 bottles, and a barrel of beer containing 72 quarts, which were received by said R. A. Metcalf, on or a short time after the month of June, 1910, was ordered by the said Metcalf for his own personal use, or for the purpose of selling, bartering, giving away, or otherwise furnishing the same in violation of law.

"That then and there, being a witness as aforesaid, the said R. A. Metcalf did knowingly, willfully, corruptly, feloniously, and falsely testify, depose, and. say, in substance and effect, that he (the said R. A. Metcalf) never owned at any time any whisky or beer or had any whisky or beer in the said Yellow Front Restaurant, in the town of Gage, and that the whisky and beer in said restaurant, or any portion of it, which was in the said restaurant on the 15th day of September, 1910, at the time the same was searched by the said sheriff of Ellis county, did not belong to him, the said R. A. Metcalf, and that the said R. A. Metcalf, before the time of the said search of said building on September

Cr. 8—19

15, 1910, had no knowledge of any whisky or beer being in said restaurant at any. time; that he had not at any time owned or controlled or managed or been employed at the said Yellow Front Restaurant as clerk or otherwise, and had never had any interest there at any time or any interest in said restaurant and business at any time, and that he (the said R. A. Metcalf) had never received any compensation for working there at any time from Ed Hickman or any other person, and never took the money coming to said restaurant in the course of business, and that he never at any time had a key to said building; that he (the said R. A. Metcalf), before the said restaurant was searched by said sheriff on or about September 15, 1910, did not know of the existence of a partition in the wall or walls of said building or its rooms, which made a secret place difficult of detection, in which liquor could be secreted, and had no knowledge that any whisky or beer was secreted in said partition and walls of said building and rooms, prior to the time the same was searched on September 15, 1910, and had never known of any one going back of the partition running north and south across said building to get whisky or beer from said secret place in the walls and partition of said building, which was so discovered by the said sheriff of Ellis county aforesaid mentioned on or about September 15, 1910, before the same was discovered by said sheriff, and that he (the said R. A. Metcalf), at all times prior and up to the time of the discovery of said whisky and beer in the walls and partitions of said building as aforesaid, had no knowledge of any whisky or beer being in said secret place in the walls and partitions of said building, or in the room of said restaurant where the said liquor was so discovered by said sheriff, or in any other part of said room in which said liquor was so discovered, or in said restaurant; that at the time said restaurant was searched as aforesaid, and immediately after the said sheriff handed the search warrant to said R. A. Metcalf, he (the said R. A. Metcalf) handed it back to said sheriff or to one Daniel Rees; that James Johnson and Joe Siddens were the only persons who ever worked in said restaurant; that the said R. A. Metcalf did not sell whisky to one John Quillen on or about September 10, 1910,. and that he (Metcalf) did not sell one pint of whisky to said John Quillen on or about August 17, 1910; that he (the said Metcalf) never had intoxicating liquors shipped or consigned to him to places in the state of Texas, and after the same was delivered there brought to Gage, Oklahoma; that a United States retail liquor dealer's license or stamp, which was held by said Metcalf from the period of time from August, 1910, to July 1,

1911, was obtained by him from the United States Collector or Deputy Collector of Internal Revenue, who had advised and instructed him to obtain the same, and that the said license or stamp was not used by said Metcalf as a retail liquor dealer, and that all the liquor ever received or owned by the said R. A. Metcalf was a cask of whisky of 24 bottles and a barrel of beer of 72 quarts, both of which were ordered by the said R. A. Metcalf in the month of June, 1910, for his own personal use, and was used by said R. A. Metcalf personally and was not sold, bartered, given away, or otherwise furnished or illegally disposed of in any way, which said false testimony is more fully shown by the questions then and there asked of said R. A. Metcalf when so testifying as said witness, and the answers then and there given to said questions, by said defendant R. A. Metcalf, which questions and answers are as follows:

"The following questions were asked and answers given: 'Q. I will get you to state whether you ever owned any whisky or beer in the Yellow Front Restaurant in the town of Gage, Oklahoma. A. No, sir. Q. I will get you to state whether or not you ever had control or the management of the Yellow Front Restaurant in the town of Gage. A. No, sir; only loafed around there. Q. Have any interest there? A. No, sir. Q. Neither as an employee or otherwise? A. No, sir.'

"And the following questions were asked and answers given: 'Q. State whether or not if any portion of the whisky or beer that was in that building at that time belonged to you. A. Didn't own nothing. Q. How came you to be in there at that time? A. Asleep.'

"And the following questions were asked and answers given: 'Q. Had any business until you took charge of the city hotel? A. No, sir.'

"And the following questions were asked and answers given: 'Q. Had any business of any kind during this time? A. No, sir. Q. You didn't have any liquor in this restaurant that was searched? A. No, sir.'

"And the following questions were asked and answers given: 'Q. You work around that Yellow Front Restaurant and did not receive any compensation? A. No, sir. Q. Ever help in the business? A. Helped Joe Siddens make chile, and once in a while I would get some one a cigar. Q. Ever receive any compensation for working there? A. No, sir; I think the fact I was in there most every day.'

"The following questions were asked and answers given: 'Q. You there all day? A. No, sir. Q. Generally opened up

in the morning? A. Never had a key. Q. Never had a key? A. Don't believe I ever did.'

"And the following questions were asked and answers given: 'Q. Yet you never run the place at all? A. No, sir. Q. You would be the clerk in there sometimes until night? A. No, sir. Q. Help them some? A. No, sir. Q. Never clerked in there? A. No, sir. Q. Jimmy Johnson and Joe Siddens were the only ones working in there? A. Yes, sir. Q. Certain? A. Yes, sir. Q. Sometimes be the only one in front? A. I think not.'

"And the following questions were asked and answers given: 'Q. See anybody come back of the partition running north and south? A. No, sir.'

"And the following questions were asked and answers given: 'Q. Didn't know anything about the partition being in the wall? A. No, sir. Q. Never heard of it? A. Not until they raided it. Q. Never knew of any one getting anything out of there? A. No, sir. Q. Not Jimmy Johnson? A. No, sir. Q. Joe Siddens? A. No, sir. Q. Ed Hickman? A. No, sir. Q. Never knew whisky or beer was in there? A. No, sir. Q. Never knew that beer and whisky was in that room? A. No, sir.'

"And the following questions were asked and answers given: 'Q. Any one pay you anything for working around there? A. I might have waited on some one once in awhile. Q. Never received any money? A. No, sir. Q. Never got any money from Ed Hickman? A. No, sir. Q. Never had been employed by Ed Hickman? A. No, sir.'

"And the following questions were asked and answers given: 'Q. Mr. Rader hand you the search warrant? A. Yes, sir. Q. What did you say? A. I said "Search," and handed it back. Q. You never told him that you owned it or any such remark? A. No, sir.'

"And the following questions were asked and answers given: 'Q. Are you positive that you gave this search warrant back to Rader? A. My remembrance is that I handed it to Rader or Rees one. Q. Didn't Mr. Rader say that he wanted to search your place when he went in there? A. He said he had a search warrant; I didn't understand just what he said; he handed me a search warrant, and I handed it to the one or the other of them.'

"And the following questions were asked and answers given: 'Q. Mr. Metcalf, you testified that you were around that restaurant considerable; now I will get you to state who you think was running the restaurant. A. I think Ed Hickman owned it. Q. But who do you think run it? A. I suppose Joe Siddens and Jimmy Johnson run it. Q. Which one was controlling it, Joe Sid-

dens or Jimmy Johnson? A. Both working there. Q. They were running it? A. They were running it and working there. Q. Thought Ed Hickman owned it? A. Yes, sir.'

"And the following questions were asked and answers given: 'Q. Ed Hickman ever make arrangements with you to work around there? A. No, sir.'

"And the following questions were asked and answers given: 'Q. For what purpose did you order this liquor? A. To drink. Q. Own personal use? A. Yes, sir. Q. Whisky and beer for your own personal use to be used by you in the town of Gage, Oklahoma? A. Yes, sir.'

"And the following questions were asked and answers given. 'Q. I will get you to state whether or not these two shipments you have named is the only two you had shipped to you at the town of Gage? A. Only two in my life. Q. Shipped for your own personal use? A. Yes, sir.'

"And the following questions were asked and answers given: 'Q. Tell the circumstance of that license being issued. A. Took the license out after having this shipment shipped. Q. Why? A. The revenue man instructed me to. Q. On account of having it shipped to you? A. Yes, sir; I was running the Arcade hotel; they got an injunction against it; some one was using whisky there, I don't know who.'

"And the following questions were asked and answers given: 'Q. You took it out on account of the revenue man telling you about this? A. Yes, sir; he told me it might be better for me to take out a license on account of these shipments; I only used it for my own personal use though. Q. That is the only reason that you took it out? A. Yes, sir.'

"And the following questions were asked and answers given: 'Q. I will ask you if you did not on or about the 10th day of September, 1910, sell John Quillen whisky? A. No, sir. Q. Do you swear that you didn't sell him whisky? A. Yes, sir. Q. If he swore to that, it is a falsehood? A. Yes, sir; first time I ever knew John Quillen was when Mark Bishop run a foot race. Q. Never knew him then? A. I knew his face first time I ever seen him around here. Q. I will ask you if you didn't sell John Quillen, on the 17th day of August, one pint of whisky? A. No, sir. Q. I will ask you if you didn't induce John Quillen to leave in order that he might not be a witness in this cause? A. No, sir. Q. Never asked him to leave? A. No, sir.'

"And the following questions were asked and answers given: 'Q. Isn't it a fact that you had liquor shipped over to Texas points and had it shipped over here? A. No, sir. Q. How much whisky

was it that you had shipped in? A. 24 bottles. Q. Drink all that yourself? A. Yes, sir.'

"In all which particulars the testimony, statements, and declarations so testified and deposed unto by the said R. A. Metcalf were then and there material matter in and to said case of State of Oklahoma v. R. A. Metcalf, charged with the unlawful possession of intoxicating liquors, as aforesaid, instituted, begun, and heard as aforesaid, and were then and there not true, but false, and were then and there by said R. A. Metcalf not believed to be true, but were then and there by said R. A. Metcalf believed to be false, contrary to the form of the statutes in such cases made and provided, and against the peace and dignity of the state.

"Wherefore he prays that a warrant may issue for the arrest of the said R. A. Metcalf that he may be dealt with according to law.

"FRANK E. RANSDELL.

"Sworn to and subscribed before me this 2d day of August, A. D. 1911.

."[Seal.]     C. H. HOLMES,

"Clerk County Court."

*Leedy & Anderson,* for relator.

*Smith C. Matson,* Asst. Atty. Gen., and *Frank E. Ransdell,* Co. Atty., for the State.

FURMAN, J. (after stating the facts as above). In the trial of the case, in which it is alleged that relator committed perjury, he was charged with unlawfully having possession of intoxicating liquors found in the "Yellow Front Restaurant" in the town of Gage, Okla., with the intention of violating the provisions of the prohibitory liquor law. The state relies upon the first eight predicates of the complaint, and particularly upon the second and third predicates, which are as follows:

"Whether the said R. A. Metcalf ever had control of or had the management of the said restaurant, or had any interest in the said restaurant, or run the same as an employee or otherwise; and whether the said R. A. Metcalf worked around, at, or in said restaurant."

That part of the testimony of the relator, Metcalf, given in the first trial, and which is applicable to these last two-mentioned predicates, is as follows:

"Q. I will get you to state whether or not you ever had control or the management of the Yellow Front Restaurant in the town of Gage? A. No, sir; only lived around there. Q. Had any interest there? A. No, sir. Q. Neither as an employee or otherwise? A. No, sir. Q. State whether or not if any portion of the whisky or beer that was in that building at that time belonged to you. A. Didn't own anything. Q. How came you to be in there at that time? A: Asleep. Q. Had no business until you took charge of the city hotel? A. No, sir. Q. You worked around that Yellow Front Restaurant and did not receive any compensation? A. No, sir. Q. You there all day? A. No, sir. Q. Generally opened up in the morning? A. Never had a key. Q. Yet you never run the place at all? A. No, sir. Q. You would be the clerk in there sometimes until night? A. No, sir. Q. Helped them some? A. No, sir. Q. Never clerked in there? A. No, sir. Q. Jimmy Johnson and Joe Siddens were the only ones working in there? A. Yes, sir. Q. Certain? A. Yes, sir."

It will be noticed that the relator testified positively that he never clerked in the restaurant, and that he was not the owner of the restaurant; that he was not an employee there, and was not connected with the restaurant as an employee or otherwise.

The direct and positive proof which the state has of the fact that relator was clerking in the restaurant, and was running and operating the restaurant, is the positive testimony of the witness Daniel Rees, who testified, in direct terms, that he watched the relator every night for a month, and that he was the person clerking and waiting on the customers on the side of the restaurant where the drinks were sold, and was the only one clerking there. What more positive proof can be, that a man is working in or clerking in a place of business, than that he sells the goods and receives the money for them and is the only one who does sell the goods and receive the money for them? Rees is corroborated by the witness Holmes, who testified to selling relator the fixtures and restaurant supplies that went into the restaurant; by the witness O. B. Lippincott, who testified to selling the relator restaurant supplies at about the time the restaurant was first opened up; by the witness W. B. Barnes, who testified to selling the relator meat for the restaurant and collecting the pay for the same from the relator on about twenty different occasions; by the witness L. E. Barker, who testified to delivering ice to the restaurant

and being paid for the same by the relator; by the witness Wm. McDonald, who testified that the relator Metcalf paid the electric light bills; also by the witness C. A. Greene, who testified that the relator paid to him electric light bills for the restaurant; by the testimony of all the last-mentioned witnesses that they saw the relator around the restaurant from time to time, and going in and out of the restaurant as though it were his; also by the evidence of the witness G. M. Rader that, when he went to search the place on the 15th day of September, 1910, and presented the search warrant to the relator and told him that he had a search warrant for his place, relator told him to go ahead and search, or something to that effect; also by the statement of the relator to the party searching the restaurant that "people would get drunk and come into our place, and we get the blame for it." What better proof can be given that a man is clerking in or employed in, or is the owner of, a place, than that he furnishes the place in the first place, waits on customers continuously while the business is being run, pays the bills, such as electric light bills and water bills, and is continuously seen around the place, and speaks of the place as being "my place" or "our place"? Under this testimony, relator was clearly connected with and responsible for the intoxicating liquors found in the restaurant with which he was so connected. Therefore his testimony upon the first trial was material to the issue, and, if false, constituted perjury.

If the state produced evidence sufficient to support any one material predicate of perjury set out in the information, relator should not be discharged. *Hereford v. People,* 197 Ill. 222, 64 N. E. 310; *Bradford v. State,* 134 Ala. 141, 32 South. 742; *Adellberger v. State* (Tex. Cr. App.) 39 S. W. 103; *State v. Anderson,* 35 Utah, 496, 101 Pac. 385. It is not required that one witness swear to all the facts necessary to disclose the falsity of defendant's testimony. It is sufficient if the state has proved all the necessary facts by the direct and positive testimony of witnesses, and has supported the same by other corroborative evidence. *People v. Green,* 54 Cal. 592. In this case, however, the witness Daniel Rees gives enough direct and positive testimony which, if corroborated by other circumstances, is sufficient to

sustain the finding of the committing magistrate; but that part of the evidence of the other witnesses, to the fact of their seeing the relator clerking there and paying the bills and performing the acts of an owner or an employee, is direct and positive evidence, as contemplated by the rule, because one of the material questions, in the trial of the case in which the relator is accused of committing perjury, was as to whether relator owned or was running or operating the restaurant. There is no more technical court than that of Texas, yet that court holds that "the falsity of defendant's statement can be established by circumstantial evidence; but the facts constituting such circumstantial evidence must be directly and positively sworn to by at least one credible witness, supported by corroborating evidence." See *Plumber v. State,* 35 Tex. Cr. R. 202, 33 S. W. 228; *Beach v. State,* 32 Tex. Cr. R. 240, 22 S. W. 976; *Franklin v. State,* 38 Tex. Cr. R. 346, 43 S. W. 85.

In *Plumber v. State, supra,* the court lays down the correct rule as follows:

"The statute (Code Criminal Procedure, art. 746) requires that the falsity of a statement be established by the testimony of two credible witnesses, or by one credible witness strongly corroborated. We hold that the falsity of a statement can be established by the circumstantial evidence; that this must be done by the testimony of at least two credible witnesses, or by one credible witness strongly corroborated, as the law requires. If in all criminal cases the guilt of the accused can be established by circumstantial evidence, why cannot the falsity of a statement in a perjury case be established by the same character of evidence? The difference between other cases and perjury is this: While one witness may be sufficient to establish the guilt of the accused in other cases, the law requires two credible witnesses, or one credible witness strongly corroborated. It is not the character of the proof that is contemplated by the statute, but the number and character of the witnesses."

The evidence in this case is sufficiently direct and positive to sustain a conviction. *State v. Marsh,* 73 Vt. 176, 50 Atl. 861.

Perjury may be committed by willfully swearing falsely to material circumstances which tend to prove or disprove the main fact immediately in issue. *Commonwealth v. Grant,* 116 Mass. 17; *People v. Barry,* 63 Cal. 62; *State v. Day,* 100 Mo. 242, 12

S. W. 365; *State v. Wakefield,* 73 Mo. 549, and cases cited; *State v. Lavelley,* 9 Mo. 834; *Studdard v. Linville,* 10 N. C. 474; *Smith v. State,* 91 Ark. 200, 120 S. W. 985; *United States v. Shinn* (C. C.) 14 Fed. 447; *State v. Miller,* 26 R. I. 282, 58 Atl. 882, 3 Ann. Cas. 943; *State v. Swafford,* 98 Iowa, 362, 67 N. W. 284; *Rahm v. State,* 30 Tex. App. 310, 17 S. W. 416, 28 Am. St. Rep. 911; *State v. Moran,* 216 Mo. 550, 115 S. W. 1126.

In *State v. Miller, supra,* the Supreme Court of Rhode Island, quoting *Rahm v. State, supra,* lays down the correct rule:

"We think it may be laid down as the rule that any testimony which is relevant in the trial of a given case, is so far material to the issue as to render a witness, who knowingly and willfully falsifies in giving it, guilty of the crime of perjury."

And in *State v. Lavelley, supra,* the court says:

"It is not necessary that the evidence given is material to the main issue; it is sufficient if it is material to any proper matter of inquiry."

And in *Studdard v. Linville, supra,* the court, in substance, says that, if the testimony given is of any collateral matter, and which collateral matter is material to the main issue, then the witness who falsifies is guilty of perjury.

In *United States v. Shinn, supra,* the court, in speaking of the materiality of testimony upon which perjury may be predicated, says:

"But when the superfluous or collateral matter is calculated and intended to prop and bolster the testimony of the witness on some material point, as by clothing it with circumstances which add to its probability or strengthen the credibility of the witness, the case is otherwise."

In *State v. Moran, supra,* the court says:

"It does not follow, because the matter testified to is not especially concerning the acts of the defendant in the commission of the offense, that such matter might not be made a subject upon which a charge of perjury might be predicated, if such matter is material. It is but common knowledge that it frequently occurs in the trial of causes that inquiries are made of witnesses touching matters which do not directly concern the commission of the acts which constitute the offense, yet such inquiries and answers may be material and highly important to the end that triers of the

fact may properly and intelligently weigh the testimony in the case."

In the case of *Coleman v. State,* 6 Okla. Cr. 252, 118 Pac. 594, this court said:

"It is not necessary that the matter sworn to be directly and immediately material in order to constitute the offense of perjury. It is sufficient if it is so connected with the matter at issue as to have a legitimate tendency to prove or disprove some fact that is material from the testimony of a witness thereto. This is sufficient, and makes the testimony material. It has therefore been held that perjury may be assigned upon false statements affecting a collateral issue as to the credibility of a witness; this being material to the main issue. This was directly passed upon by the Supreme Court of Kansas in the case of *State v. Park,* 57 Kan. 432, 46 Pac. 713. The Supreme Court of that state there laid down the true rule as follows: 'To constitute perjury, the false statements must be material to the subject under consideration, or such as would tend to influence the determination of the issues to be decided. The question whether the defendant had been previously prosecuted and punished for committing grand larceny in Missouri, although in a certain sense collateral to the question on trial, can hardly be treated as immaterial. In the trial wherein false statements are alleged to have been made, Park voluntarily became a witness in his own behalf, and he was therefore subject to the same rules on cross-examination as any other witness. He having assumed the position of a witness, it was competent for the state, upon cross-examination, to test his veracity and credibility. It is well settled in this state that a defendant may be asked questions disclosing his past life and conduct; and the state may even go to the extent of inquiring if he has ever been convicted of the same offense as that for which he is upon trial. *State v. Pfefferle,* 36 Kan. 90, 12 Pac. 406; *State v. Probasco,* 46 Kan. 310, 26 Pac. 749; *State v. Wells,* 54 Kan. 161, 37 Pac. 1005. Not only was the statement of the witness therefore competent, but it had an important bearing upon the credit to be given to his whole testimony; and it is generally held to be perjury to swear falsely to anything affecting the credibility of the witness himself or the credibility of another witness in the case. In *Wood v. People,* 59 N. Y. 117, it is held that "it is not necessary that the false statement tends directly to prove the issue in order to sustain an indictment for perjury. If circumstantially material, or if it tends to support and give credit to the witness in respect to the main fact, it is perjury." The Texas Court of Appeals has held that perjury may be predicated

on a false answer of a witness that he has never been convicted of a felony, as such answer affects his credibility, and is therefore material to the issue. *Williams v. State*, 28 Tex. App. 301, 12 S. W. 1103. See, also, *United States v. Landsberg* (C. C.) 23 Fed. 585; *Washington v. State*, 22 Tex. App. 26, 3 S. W. 228; 2 Bishop's New Crim. Law, sec. 1032; Clark's Crim. Law of Canada, 389; Tiffany's Crim. Law, 850.' · The degree of materiality is of no importance. Any false statement made by a witness, which detracts from or adds weight and force to testimony as to matters that are directly material, thereby becomes material itself and may constitute perjury. Section 195, 3 Greenleaf on Evi., is as follows:· 'As to the materiality of the matter to which the prisoner testified, it must appear either to have been directly pertinent to the issue or point in question, or tending to increase or diminish the damages, or to induce the judge or jury to give readier credit to the substantial part of the evidence. But the degree of materiality is of no importance; for, if it tends to prove the matter in hand, it is enough, though it be but circumstantial. Thus falsehood in the statement of collateral matter, not of substance, such as the day in an action of trespass, or the kind of stuff with which an assault was made, or the color of his clothes, or the like, may or may not be criminal, according as they may tend to give weight and force to other and material circumstances, or to give additional credit to the testimony of the witness himself, or of some other witness in the case. And therefore every question upon the cross-examination of a witness is said to be material. In the answer to a bill in equity, matters not responsive to the bill may be material. But where the bill prays discovery of a parol agreement, which is void by the statute of frauds, and which is denied in the answer, this distinction has been taken: That, where the statute is pleaded or expressly claimed as a bar, the denial of the fact is immaterial, and therefore no perjury; but that where the statute is not set up, but the agreement is incidentally·charged, as, for example, in a bill of relief, the fact is material, and perjury may be assigned upon the denial.' "

Counsel for relator contend that the only material question in the cause' tried for illegal possession of intoxicating liquors in the county court of Ellis county, where the relator gave his testimony for which he is being prosecuted, is the question of whether or not he owned the liquor, and that the question of whether or not the relator was employed in, or worked about, the restaurant, and sold goods and collected for the same, and furnished up the restaurant and paid the bills after the restaurant was

being operated, is wholly immaterial. We find no provision of the Oklahoma statutes which requires the state to prove, in a prosecution for illegal possession of intoxicating liquors, that the defendant is the owner of the liquor. The main question and issue in the trial of the cause, where this relator gave his testimony for which he is being prosecuted, was whether or not he was in possession of the liquor. The facts disclosed by the evidence are that, at the time the restaurant was raided by the sheriff of Ellis county and his deputies, the relator was in the room where the liquor was concealed, and was the only one in the room; that relator had taken out a United States license authorizing him to conduct the business of a retail liquor dealer; that he had just gotten up out of bed, which was in the room; that he was handed a search warrant and was told that they wanted to search his premises, and he replied to go ahead and search. At this time he was standing over close to where the liquor was afterwards discovered to be secreted in the walls of the building; but, after the making of the search, he made his escape and did not return for two days, and finally returned with the man Ed Hickman, whom the relator tried to show, in the trial for illegal possession of liquor, was the keeper of the restaurant.

In the trial of the case for illegal possession of intoxicating liquors, the relator denied that he owned the restaurant or the liquor in the restaurant; that he had anything to do with the restaurant as an employee or otherwise; or that he clerked in the restaurant. The transcript of the evidence, given by the relator in his trial for the illegal possession of the liquors, will show that nearly all of this evidence was brought out by his attorney in his direct examination. No doubt his attorney thought that this evidence was material as to whether or not the relator was in possession of the liquor; and in this respect we agree with his counsel that nothing can be more material as to the question of whether or not a man is in possession of liquor found in the building than the fact that he was working there. It is true that the relator weakened in his cross-examination upon his statement that he never clerked in the restaurant, or was connected with it, by stating that he once in a while would get somebody a cigar, and

was in the restaurant perhaps once every day; but he maintained stoutly, throughout his testimony, to the declarations made in his direct examination mentioned above, that he did not clerk there and was not employed there, and was not the owner of the restaurant, and was not connected with it as an employee or otherwise, and never had any interest in the restaurant as an employee or otherwise.

The first predicate in the complaint is whether the said R. A. Metcalf, relator in this case, owned, had, or was in possession of any whisky or beer in the place known as the "Yellow Front Restaurant" on the east side of Main street in the town of Gage, Okla., at any time from the 1st day of August, 1910, to the 13th day of March, 1911, and particularly on the 15th day of September, 1910. Has the state offered sufficient direct and positive testimony of the relator's possession of this liquor? The evidence is positive that relator worked in the restaurant either as owner or employee. If he had no guilty connection with this liquor, why had he gone to the expense of taking out a United States internal revenue license as a retail liquor dealer? The evidence is that he spoke of the restaurant as being "our" restaurant, and that, when he was told that the officers had a search warrant for his restaurant, he said, "Go ahead and search," and that, at this time of the search by the officers, he was in the room where the liquor was stored, standing over close to it, and was the only one there, and that he ran off as soon as the liquor was found, and could not be found by the officers for two days. It is true that the state has not proven that he had a lease on the building, and has not shown how the liquor came to be so secreted, or where it came from. But what better proof can you have of possession than that a man is actually in charge of a place and is there, and that he has been running and operating a place for a month previous to that time; that he sold goods there every night for a month, when he was being watched, and was the only one who sold liquors, and that he was seen by the witness watching him; that on all of the occasions he would go back behind the partition, where the liquor was secreted, so that he would only have to take two steps from the door, where he would be seen leaving the front

room, to where the liquor was found secreted in the walls; that he bought the fixtures and supplies used in furnishing up the restaurant; that he paid the bills there for meat, for electric lights, and for ice, and was the only one who ever paid any bills, with the exception of about one or two bills paid by the other parties working there. There could be no more direct and positive evidence that he was the one in charge of the restaurant than that we have offered in this case; and, if the restaurant was his, he is presumed to be in possession of all the goods in the restaurant, including the liquors. Especially is this true since the relator has paid the tax as a United States retail liquor dealer. We therefore hold that the third predicate of the complaint is supported by an abundance of legal and competent evidence, and that the first eight predicates of the complaint are also supported by sufficient evidence to justify the committing magistrate in binding the relator to the district court.

In the light of this testimony, the action of the examining court, in committing relator for trial in the district court, is approved and commended. If all of the prosecuting attorneys and trial judges in Oklahoma will follow the example set by the officers of Ellis county in this case, perjury will soon be as dangerous as it is odious, and will become a lost art in Oklahoma—a consummation most devoutly to be wished.

We should have decided this case long since, but we are simply overwhelmed with cases demanding immediate attention; and as this is the first time the question has been submitted to us as to the condition under which a prosecution for perjury can be sustained upon circumstantial evidence only, and as counsel for relator has filed an exceedingly able and ingenious brief, to avoid the possibility of making a mistake and rendering a decision which would have to be abandoned, we thought it best to take ample time and render such an opinion as will be a precedent for the future. When the case was first submitted on oral argument we were impressed with the idea that possibly a mistake had been made; but upon a careful examination and re-examination of the record, and after considering and weighing all of the authorities and getting at what we regard as the very truth of the

matter, we find that the action of the officers of Ellis county was in all respects right and proper. A critical examination of the authorities cited in this opinion will show that they each and all sustain the conclusion at which we have arrived. Having deliberately weighed the questions involved in this case, and having arrived at a satisfactory conclusion, we will make short work of such cases as this in the future.

The writ of *habeas corpus* is discharged,, and the relator is remanded to the custody of the sheriff of Ellis county, to be dealt with as the law directs.

ARMSTRONG, P. J., and DOYLE, J., concur.