No. 59,513

STATE OF KANSAS, *Appellee*, v. ITHIEL LAWTON, *Appellant*.

(734 P.2d 1138)

Opinion filed March 27, 1987.

*Melissa Sheridan,* assistant appellate defender, argued the cause, and *Benjamin C. Wood,* chief appellate defender, was with her on the brief for appellant.

*Gene M. Olander,* district attorney, argued the cause, and *Robert T. Stephan,* attorney general, was with him on the brief for appellee.

The opinion of the court was delivered by

PRAGER, C.J.: This is a direct appeal by the defendant, Ithiel Lawton, from convictions of two counts of aggravated battery against a law enforcement officer (K.S.A. 21-3415) and one count of aggravated assault of a law enforcement officer (K.S.A. 21-3411). This case arose out of a shooting which took place at the home of the defendant's parents at 1126 Lime Street, Topeka, Kansas. On March 5, 1985, at approximately 7:00 a.m., police officers were summoned by defendant's father to a domestic disturbance at that address. As the police officers approached the residence, the defendant opened fire with a shotgun on the police officers. Officer Reed was shot in the face, neck, and shoulder. Officer Horn was shot in the hand. Shots were also fired at Officer Meier, but he was not hit. The officers surrounded the house and eventually took defendant into custody. A subsequent search of the house produced a 12-gauge shotgun with spent rounds of 12-gauge ammunition. The facts surrounding the shooting were not in controversy at the trial.

The sole defense presented by defendant was that defendant was legally insane at the time the shooting occurred. On March 6, 1985, defendant was charged with two counts of aggravated battery against a law enforcement officer and one count of

aggravated assault of a law enforcement officer. On March 7, 1985, the district court ordered a mental examination to determine defendant's competency to stand trial. Defendant was found incompetent and committed to Larned State Security Hospital pursuant to K.S.A. 22-3303. Defendant was discharged from the security hospital on September 26, 1985, and returned to Shawnee County. Thereafter, defense counsel informed the court of defendant's intention to rely on the defense of insanity. On November 4, 1985, defense counsel moved for an order to determine defendant's competency to understand the criminal proceedings and assist in his defense. On November 5, 1985, the district court ordered a mental examination. Defendant was again found incompetent to stand trial and committed to Larned State Security Hospital on November 6, 1985. On February 6, 1986, he was discharged and returned to Shawnee County.

A preliminary hearing was held, after which defendant waived his right to a trial by jury. The case was tried to the court without a jury on April 24, 1986. At the trial, there was a stipulation as to the admission of certain joint exhibits consisting of a transcript of an interview by a police officer with the defendant on the date of the shooting, March 5, 1985; a memorandum from a detective concerning the apprehension of defendant; a transcript of the preliminary hearing; and a statement given to the police by defendant's mother on March 5. Both counsel for the State and counsel for the defendant moved to admit these exhibits into evidence. The State then rested.

During presentation of defendant's evidence, the court received into evidence, by stipulation, joint exhibits 5 and 6. Exhibit 5 was a voluminous collection of reports of defendant's frequent hospitalizations in Topeka State Hospital from 1969 to the time of the trial. Exhibit 6 consisted of a similar report from Larned State Security Hospital dating back to 1979. The evidence was undisputed that defendant had consistently been diagnosed as suffering from chronic paranoid schizophrenia.

Defense counsel then called as witnesses Dr. Daniel E. Pickar, a clinical psychologist, and Dr. William S. Logan, a psychiatrist. Each of these doctors gave his expert opinion as to defendant's mental condition at the time of the shooting on March 5, 1985.

Based upon the evidence presented, the trial court found that defendant was legally sane and criminally responsible for his acts in shooting at the police officers. The trial court sentenced defendant to consecutive sentences and then suspended the sentences and committed defendant to Larned State Security Hospital pursuant to K.S.A. 22-3430. Defendant brought a timely appeal to this court.

The sole issue presented on the appeal is whether there is substantial competent evidence in the record to support the trial court's finding that the defendant was legally sane at the time he shot at the police officers.

At the outset, it would be helpful to review the basic principles to be applied where a defense of legal insanity is asserted in a criminal action. These principles are set forth in *State v. Nemechek,* 223 Kan. 766, 576 P.2d 682 (1978), where it is stated:

" 'There is a presumption of sanity in a criminal proceeding that may be relied upon by the prosecution to establish a prima facie case. (*State v. Coltharp,* 199 Kan. 598, 433 P.2d 418 [1967].) The prosecution is never required to introduce evidence of sanity until some evidence is introduced which, if believed by the jury, could raise a reasonable doubt as to a defendant's sanity at the time the offense was committed. (See, *State v. Penry,* 189 Kan. 243, 368 P.2d 60 [1962]; *Wilson v. United States,* 288 F.2d 121 [D.C. Cir. 1960]; *State v. Clokey,* 83 Idaho 322, 364 P.2d 159 [1961]; *People v. Smothers,* 2 Ill. App. 3d 513, 276 N.E.2d 427 [1971], *aff'd* 55 Ill. 2d 172, 302 N.E.2d 324 [1973].) This evidence may come from either the defendant or the state. (*State v. Johnson,* 92 Kan. 441, 446, 140 Pac. 839 [1914]; *State v. Crawford,* 11 Kan. 32, 45 [1873]; *Davis v. State,* 90 Neb. 361, 133 N.W. 406 [1911]; *Lemke v. State,* 56 Okla. Crim. 1, 9, 32 P.2d 331 [1934].) The term 'evidence,' however, does not include the insanity plea or opening statements. Neither rebuts the presumption of sanity. (*State v. Coltharp,* supra at 602; *State v. Mendzlewski,* 180 Kan. 11, 13, 299 P.2d 598 [1956]; *United States v. Currier,,* 405 F.2d 1039, 1042 [2d Cir. 1969], *cert. denied* 395 U.S. 914, 23 L. Ed. 2d 228, 89 S. Ct. 1761 [1969]. *Cf. United States v. Marbley,* 410 F.2d 294 [5th Cir. 1969].) . . . .

" 'The presumption of sanity is rebutted when evidence is introduced which could raise a reasonable doubt concerning a person's sanity. (*State v. Johnson,* supra at 447.) At that point the question of sanity becomes a question for the jury, assisted by proper instructions. (*State v. Johnson,* 223 Kan. 237, 240, 573 P.2d 994 [1977]. *State v. Coltharp,* supra at 603. *State v. Mendzlewski,* supra at 14.) If the jury has a reasonable doubt as to a defendant's sanity at the time the offense was committed, it is under a duty to acquit the defendant. (*State v. McBride,* 170 Kan. 377, 226 P.2d 246 [1951]; *State v. Nixon,* 32 Kan. 205, 4 Pac. 159 [1884]; *State v. Crawford,* supra at 43.) It is a rare occasion when an insanity question should be taken from a jury by a motion for acquittal. In *State v. Gustin,* 212 Kan. 475, 510 P.2d 1290 (1973), we said:

" 'A trial judge in passing upon a motion for judgment of acquittal must determine whether upon the evidence, giving full play to the right of the jury to determine credibility, weigh the evidence, and draw justifiable inferences of fact, a reasonable mind might fairly conclude guilt beyond a reasonable doubt. If he concludes guilt beyond a reasonable doubt is a fairly possible result, he must deny the motion and let the jury decide the matter. If he concludes that upon the evidence there must be such a doubt in a reasonable mind, he must grant the motion.' (Syl. ¶ 3.)

"In *State v. Chase*, 207 Kan. 352, 362, 480 P.2d 62 (1971), we quoted from *Dusky v. United States*, 295 F.2d 743, 756 (8th Cir. 1961), as to the test for acquittal in an insanity defense case:

" ' ". . . [I]n order to remove this case from the jury's considera-tion. . . . 'reasonable men must necessarily possess a reasonable doubt as to defendant's sanity and . . . reasonable men must conclude that the government has failed to sustain its burden of proving beyond a reasonable doubt that the accused had the capacity to commit the crime.' . . .' "

"Unless evidence of insanity is so great that a trial judge can rule the government could not convince a reasonable man it has sustained its burden of proof as to defendant's sanity, the issue should go to the jury, as we have recommended in the past. (E.g., *State v. Sagebiel*, 206 Kan. 482, 480 P.2d 44 [1971]; *State v. Chase*, supra; *State v. Coltharp*, supra; *State v. Mendzlewski*, supra.)" pp. 767-69.

In *State v. Sanders*, 225 Kan. 147, 151, 587 P.2d 893 (1978), we find the following language:

"It is a rare occasion when an insanity question should be taken from a jury by a motion for acquittal. [Citation omitted.] The test for taking the issue of insanity away from the jury was adopted by this court in *State v. Chase*, 206 Kan. 352, 362, 480 P.2d 62 (1971). In order to remove the case from the jury's consideration on the basis of the evidence, reasonable men must necessarily possess a reasonable doubt as to defendant's sanity and must conclude that the government has failed to sustain its burden of proving beyond a reasonable doubt that the accused had the capacity to commit the crime. *Dusky v. United States*, 295 F.2d 743, 756 (8th Cir. 1961)."

*State v. Boan*, 235 Kan. 800, 686 P.2d 160 (1984), discusses the test to be applied in Kansas to determine whether a defendant is criminally insane. In Kansas, the courts apply the *M'Naghten* test. Under the *M'Naghten* test for criminal insanity, the accused is to be held not criminally responsible (1) where he does not know the nature and quality of his act, or, in the alternative, (2) where he does not know right from wrong with respect to that act. Under the "right and wrong" test of criminal insanity, it must be proved that at the material time the accused did not know that

what he was doing was contrary to law. It is not sufficient to prove that he believed that, while what he was doing was legally wrong, it was morally right.

In the present case, the trial court found from the evidence presented at the trial that the defendant, Lawton, understood the nature and quality of his act in shooting at the police officers and further understood that what he was doing was legally wrong. Having rejected the defense of legal insanity, the trial court found defendant to be criminally responsible on all three counts and found him guilty of the same.

As noted heretofore, the only issue on appeal is whether there is sufficient evidence in the record to support the trial court's findings that the defendant was legally sane at the time he committed the acts of shooting at the police officers. The defendant argues that the evidence was not sufficient to sustain the findings of the trial court.

The scope of appellate review when defendant challenges the sufficiency of the evidence to support a conviction is whether the evidence, viewed in the light most favorable to the prosecution, convinces the appellate court that a rational factfinder could have found defendant guilty beyond a reasonable doubt. The appellate court looks only to the evidence in favor of the verdict to determine if the essential elements of the charge are sustained. *State v. Van Cleave*, 239 Kan. 117, 716 P.2d 580 (1986).

We have concluded from our review of the record that the finding of the trial court that defendant was not legally insane at the time of the shooting is supported by substantial competent evidence. In the present case, there was no dispute that defendant had a severe mental illness. According to Dr. Pickar, defendant had the mental disease known as paranoid schizophrenia. According to Dr. Pickar, defendant is unable to think clearly, his thought processes are very illogical, and his overall concept of reality is grossly impaired. Defendant also suffers from delusional-type thinking. Dr. Pickar noted defendant sees things as very evil and he is fearful of homosexual attacks.

Dr. Pickar testified on direct examination as follows:

"[A]lthough I believe that he knew he was firing on police officers and knew that they were police officers, he believed that they were, as I said, members of this 'Black Mafia,' and I think that he wasn't able to appreciate the nature of his acts,

because, from his perception, he saw that he was protecting his life, that these officers were out to harm him, possibly to take his life, to homosexually accost him, and that he perceived that he needed to protect himself from this, and was actually told by these voices to do that, and in that context, could not appreciate what he was doing, the nature of his acts, nor does it seem that he believed that he was wrong, because he saw himself as protecting himself."

On cross-examination, Dr. Pickar testified that defendant had sufficient intelligence and understanding to know that he was firing a shotgun; that he knew he was shooting a shotgun with live shells. Further, he also knew he was shooting at a uniformed police officer. Dr. Pickar testified that defendant understood the nature and quality of his act intellectually. He understood it is against the law to shoot a shotgun at a human being. Dr. Pickar testified that defendant thought it was all right under the circumstances, because he had a different value system based upon his delusional state. In response to certain questions, Dr. Pickar testified as follows:

"Q. But, he does understand, at least on an intellectual basis, that it's wrong, that it's against the law to shoot somebody. Doesn't he understand that?
"A. Yes.
"Q. He understands that it's against the law to shoot somebody with a shotgun. Isn't that correct?
"A. (No response.)
"Q. On an intellectual basis.
"A. Yes. Although, I'm not—I'm not sure that he could appreciate that at that moment.
"Q. All right. But, generally speaking, Mr. Lawton, based on your interview with him, he knows it's wrong, it's against the law to shoot somebody.
"A. Yes, sir.
"Q. All right. And he's probably known that all his life, has he not; ever since he was a little fellow?
"A. I think so.
"Q. But, because of his different value system, or his delusions, under the circumstances, he thought that was all right.
"A. Yes."

On further cross-examination, Dr. Pickar testified, in substance, that at the time of the shooting defendant might not have been thinking that it was wrong, that might not have been in his consciousness. The prosecutor then further questioned Dr. Pickar as follows:

"Q. He was not consciously thinking about it, but Mr. Lawton knows that it is wrong to shoot somebody, doesn't he?
"A. Yes."

Dr. William S. Logan, Director of Law and Psychiatry at the Menninger Foundation in Topeka, also testified on behalf of defendant. He also diagnosed defendant's illness as chronic schizophrenia. On direct examination, he testified that, in his opinion, defendant did not know the wrongfulness of the act and could not appreciate the nature and consequences of his acts. Dr. Logan was of the opinion that defendant thought he was going to be attacked by members of the "Black Mafia." He further testified on direct examination that, at the time, defendant was acting under the delusion of self-defense. On cross-examination Dr. Logan testified that the defendant knew that it was wrong to shoot somebody. He saw the police in uniform and believed them to be police officers and, when they approached the front door, he intentionally and purposefully pointed and fired his shotgun at them.

In this case, it was undisputed that defendant suffered from a severe mental illness. He had been hospitalized 20 times since 1969. He was clearly dangerous to himself and to others. We have concluded from the entire record in the case, however, that the trial court did not err in finding, as a matter of fact, that defendant was legally sane at the time he committed the criminal acts.

It is clear that defendant understood the nature and quality of his acts in shooting at the police officers. Although there was conflict in his testimony, the psychologist, Dr. Pickar, testified that, at the time defendant fired at the police officers, he knew that it was against the law to shoot somebody, but, because of his different value system or his delusions, he thought that it was all right. We cannot say that the trial court abused its discretion in concluding that defendant was not criminally insane or that a rational factfinder could not have reached the same conclusion.

The factual circumstances in this case are comparable to the factual circumstances in *State v. Boan*, 235 Kan. 800, where defendant Boan's conviction was upheld, although defendant maintained that he was legally insane as a matter of law. In *Boan*, the defendant argued that the trial court had erred in failing to direct a verdict of not guilty by reason of insanity. The evidence was conflicting whether defendant knew the difference between

right and wrong at the time of the homicide. Medical experts, called on behalf of the defendant, testified that Boan had a severe mental illness and mental aberrations such as hearing voices and a preoccupation with certain ideas and concerns that are real to him but which do not make sense to others. Boan had a feeling of being God or a representative of God at the Last Supper, who had been in this world at various times and who had been threatened or attacked at various times by those who had not given him credit for his rightful position. In the opinion of Dr. Menninger, Boan had paranoid schizophrenia, sensed that other persons were in his body trying to displace him and that some of those people were at the KU Medical Center. Boan felt that he could not tolerate this and had to defend himself from what he described as "salvation level attacks." This court, in *Boan*, held that the issue of insanity was a fact question for the jury to determine, because the expert testimony as to Boan's capacity to know the difference between right and wrong was in conflict.

As pointed out in *State v. Sanders*, 225 Kan. 147, it is a rare occasion when an insanity question should be taken from a jury by a motion for acquittal. We hold that the question of legal insanity was a fact issue which was determined by the trial judge, who had an opportunity to hear the testimony of the expert witnesses. We cannot say that a reasonable mind could not have reached the conclusion that, although defendant was suffering from a serious mental illness, he was not legally insane at the time the shooting occurred.

The judgment of the district court is affirmed.

HERD, LOCKETT, and ALLEGRUCCI, JJ., dissenting.