No. 65,576

STATE OF KANSAS, *Appellee*, v. TYRONE L. BAKER, SR., *Appellant*.

(819 P.2d 1173)

Opinion filed October 25, 1991.

*Hazel Haupt*, assistant appellate defender, argued the cause, and *Jessica R. Kunen*, chief appellate defender, was with her on the brief for appellant.

*Gene M. Olander*, district attorney, argued the cause, and *Robert T. Stephan*, attorney general, was with him on the brief for appellee.

The opinion of the court was delivered by

McFARLAND, J.: Tyrone L. Baker, Sr., appeals his jury trial convictions of premeditated first-degree murder (K.S.A. 1990 Supp. 21-3401), aggravated burglary (K.S.A. 21-3716), conspiracy to commit aggravated burglary (K.S.A. 21-3302, K.S.A. 21-3716), and three counts of kidnapping (K.S.A. 21-3420).

Ida Mae Dougherty lived in the Westboro area of Topeka. She was a close friend of Lester and Nancy Haley, who lived next door, and Verne Horne, who lived across the street. During the late morning of December 4, 1989, Mrs. Horne received a telephone call from Nancy Haley, who was concerned because Ida Mae's newspaper remained in the driveway and she had failed to answer her telephone. Mrs. Horne walked over to the Dougherty home, where she met Mr. Haley. They entered the home with Mr. Haley's key. They checked the downstairs rooms and then the upstairs rooms. In a bedroom they encountered a black male (later identified as defendant), who ordered them to lie face down on the floor. A short while later, Nancy Haley arrived and was ordered to join the other two prisoners.

Later, defendant ordered the three into Ida Mae's automobile and drove them into a secluded area east of Topeka. They were ordered out of the automobile at gunpoint. When a pickup truck drove by, defendant ordered the trio back into the vehicle and drove to the end of a road from where they walked a short distance and were ordered to lie down. The Haleys complied. Mrs. Horne had, throughout the automobile trip, maintained a conversation with the defendant. He had told her various facts about himself. At this point, she told him if he had not killed Ida Mae, he was not a murderer and offered him money. Defendant stated he was not sure whether or not he had killed Ida Mae. Mrs. Horne suggested he should check on Ida Mae and said the trio would wait for his return. Defendant hesitated and then drove away.

The Haleys were elderly and quite infirm. Mrs. Horne told them to hide while she went for help. She had trouble finding the help, but ultimately received assistance from a passing motorist. Later, Ida Mae's body, covered with leaves, was found just east of the Shawnee-Douglas County line. The cause of death

was asphyxia or smothering. The Haleys' bodies were also found in Douglas County. They had been shot.

Lisa Pfannenstiel testified she was defendant's girlfriend and pregnant by him. She stated that on December 3, 1989, she and defendant were walking through Westboro looking for a house to burglarize. Defendant selected Ida Mae's home. They both saw Ida Mae in her home. They first went to the home of a friend, Chris Miller, to obtain duct tape to muffle the sound of the window glass breaking. They returned around 10:00 p.m. and saw Ida Mae cooking in the kitchen. Defendant broke a window after taping it, entered the home, and confronted Ida Mae.

Lisa testified defendant made Ida Mae lie on the floor and taped her feet together. Ida Mae began screaming, and defendant told Lisa he would have "to do her." He secured a pillow and went back to Ida Mae. Lisa heard sounds of a struggle and then it became quiet. Defendant put Ida Mae in the trunk of her car. Lisa and defendant then drove to Douglas County where defendant dumped the body and covered it with leaves. During the early morning hours of December 4, they returned to Ida Mae's home to select which belongings they wished to take. They stayed overnight. Late in the morning the Haleys and Mrs. Horne came over and were taken prisoner. Lisa placed some of Ida Mae's belongings in the car and walked to Chris Miller's residence. Later in the afternoon, defendant joined her and placed Ida Mae's belongings in a storage closet of a friend. Ida Mae's vehicle was left in a parking lot. Chris Miller drove Lisa and the defendant to the Ramada Inn South, where he obtained a room for them. Mrs. Horne testified she did not see Lisa Pfannenstiel at Ida Mae's residence but heard people talking in whispers to each other. The following day (December 5), defendant changed his appearance by cutting and permanent waving his hair. He was arrested the same day at the motel. Other facts will be stated as necessary for the discussion of particular issues.

## JURY PANEL

For his first issue, defendant contends the district court erred in denying his motion, under K.S.A. 22-3407, to discharge the jury panel.

His argument on this issue takes three routes:

1. The method of granting excuses resulted in a jury panel that was not a fair cross section of the community;

2. the judge, rather than the jury coordinator, should have heard and decided the requested excuses from service and deferrals; and

3. defendant had the right to be present in person and by counsel when any action was taken on the requests for excuses and deferrals.

Defendant's particular complaint about the prospective jurors reporting for jury service on his case is that the 60-and-over age group was overrepresented.

In *Taylor v. Louisiana*, 419 U.S. 522, 42 L. Ed. 2d 690, 95 S. Ct. 692 (1975), the United States Supreme Court held that the systematic exclusion of women during the jury selection process, resulting in jury pools not "reasonably representative" of the community, denies a criminal defendant his right, under the Sixth and Fourteenth Amendments, to a petit jury selected from a fair cross section of the community. In holding that "petit juries must be drawn from a source fairly representative of the community," the Supreme Court explained that "jury wheels, pools of names, panels, or venires from which juries are drawn must not systematically exclude distinctive groups in the community and thereby fail to be reasonably representative thereof." 419 U.S. at 538. The Supreme Court further explained that this requirement did not mean "that petit juries actually chosen must mirror the community." 419 U.S. at 538.

In *Duren v. Missouri*, 439 U.S. 357, 58 L. Ed. 2d 579, 99 S. Ct. 664 (1979), the Supreme Court held that a male criminal defendant was denied his constitutional right to a trial by a jury chosen from a fair cross section of his community when women were granted automatic exemption from jury service upon request. Building upon their holding in *Taylor v. Louisiana*, 419 U.S. 522, the Supreme Court stated the requirements necessary to establish a prima facie violation of the fair-cross-section requirement as follows:

"In order to establish a prima facie violation of the fair-cross-section requirement, the defendant must show (1) that the group alleged to be excluded is a 'distinctive' group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and

reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process." 439 U.S. at 364.

The Supreme Court concluded its analysis of the "fair-cross-section" requirements:

"We recognize that a State may have an important interest in assuring that those members of the family responsible for the care of children are available to do so. An exemption appropriately tailored to this interest would, we think, survive a fair-cross-section challenge. We stress, however, that the constitutional guarantee to a jury drawn from a fair cross section of the community requires that States exercise proper caution in exempting broad categories of persons from jury service. Although most occupational and other reasonable exemptions may inevitably involve some degree of over-inclusiveness or underinclusiveness, any category expressly limited to a group in the community of sufficient magnitude and distinctiveness so as to be within the fair-cross-section requirement—such as women—runs the danger of resulting in underrepresentation sufficient to constitute a prima facie violation of that constitutional requirement. We also repeat the observation made in *Taylor* that it is unlikely that reasonable exemptions, such as those based on special hardship, incapacity, or community needs, 'would pose substantial threats that the remaining pool of jurors would not be representative of the community.' [Citation omitted.]" 439 U.S. at 370.

Let us look now at Kansas statutes (K.S.A. 43-107 *et seq.*) and our rules on jury panel selection.

K.S.A. 43-155 provides:

"The public policy of this state is declared to be that jury service is the solemn obligation of all qualified citizens, and that excuses from the discharge of this responsibility should be granted by the judges of the courts of this state only for reasons of compelling personal hardship or because requiring service would be contrary to the public welfare, health or safety; that all litigants entitled to trial by jury shall have the right to juries selected at random from a fair cross section of the community in the district wherein the court convenes; and that all citizens shall have the opportunity to be considered for service on juries in the district courts of Kansas."

This statute is obviously intended to comply with the requirements of the United States Supreme Court.

Qualifications for jury service are governed by K.S.A. 43-156 as follows: "Every juror . . . shall be a citizen of the state, resident of the county and possess the qualifications of an elector as now, or in the future established."

Exclusions from jury service are governed by K.S.A. 43-158 and K.S.A. 43-159.

K.S.A. 43-158 provides for mandatory exclusion from jury duty as follows:

"The following persons shall be excused from jury service: (a) Persons unable to read, write, and understand the English language with a degree of proficiency sufficient to fill out a jury questionnaire form prepared by the commissioner;

(b) persons under adjudication of incompetency;

(c) persons who within ten (10) years immediately preceding have been convicted of or pleaded guilty, or *nolo contendere,* to an indictment or information charging a felony."

K.S.A. 43-159 provides for the permissive exclusion from jury duty as follows:

. "In addition to the persons excused from jury service in K.S.A. 43-158, the following persons may be excused from jury service by the court: (a) Persons so physically or mentally infirm as to be unequal to the task of ordinary jury duty;

(b) persons who have served as jurors in the county within one (1) year immediately preceding;

(c) persons whose presence elsewhere is required for the public welfare, health or safety;

(d) persons for whom jury service would cause extraordinary or compelling personal hardship;

(e) persons whose personal relationship to the parties or whose information or interest in the case to be tried is such that there is a probability such persons would find it difficult to be impartial."

This court adopted "Standards Relating to Jury Use and Management" as guidelines "to assist the District Courts in the management of jury systems within the State of Kansas." The standards were incorporated into the Supreme Court Rules relating to district courts effective July 15, 1983 (1990 Kan. Ct. R. Annot. 49). There are 19 standards set forth to guide the district courts. Standard 3 concerns the random selection procedures to be used in the juror selection process. Standard 3(c) states, in pertinent part:

"Departures from the principle of random selection are appropriate:

(i) to exclude persons ineligible for service in accordance with Standard 4,

(ii) to excuse or defer prospective jurors in accordance with Standard 6 . . . ." (1990 Kan. Ct. R. Annot. 49.)

Standard 4 provides:

"All persons should be eligible for jury service except those who:

(a) are less than eighteen years of age;

(b) are not citizens of the United States;

(c) are not residents of the county in which they have been summoned to serve;

(d) are unable to read, write, and understand the English language with a degree of proficiency sufficient to fill out a jury questionnaire;

(e) are presently under an adjudication of mental disability; or

(f) have been convicted of a felony and have not been relieved of the disabilities imposed by law." (1990 Kan. Ct. R. Annot. 50.)

Standard 6 addresses exemptions, excuses, and deferrals from jury service as follows:

"(a) All automatic excuses or exemptions from jury service should be eliminated for all persons determined eligible under Standard 4.

"(b) Eligible persons who are summoned may be excused from jury service by a judge or duly authorized court official only if:

    (i) their ability to receive and evaluate information is so impaired that they are unable to perform their duties as jurors,

    (ii) their service would be an extraordinary or compelling personal hardship to them, or to members of the public, or

    (iii) they have been called for jury service during the preceding twelve months.

"(c) Requests by eligible persons for deferral of jury service for a reasonable period of time should be liberally permitted by a judge or duly authorized court official to minimize the inconvenience and financial sacrifice of jury service.

"(d) Guidelines for determining requests for excusal and deferral should be adopted by the judges of each judicial district." (1990 Kan. Ct. R. Annot. 51.)

Standard 10 is titled "Administration of the Jury System" and significantly provides, in part:

"(c) Responsibility for administering the jury system should be vested in an administrator acting under the supervision of the court." (1990 Kan. Ct. R. Annot. 52.)

When Shirley Young, the Third Judicial District Jury Coordinator, testified at the June 18, 1990, hearing on the motion to discharge the jury panel, she testified that she was familiar with the Standards Relating to Jury Use and Management which this court adopted and that she used those standards in her duties as the Jury Coordinator for Shawnee County. Ms. Young testified that she was the administrator for Shawnee County that Standard 10(c) referred to. She further testified that she excused or deferred prospective jurors in accordance with Standard 6.

Of the 89 prospective jurors who were excused, and the 49 prospective jurors who were deferred, Ms. Young testified that the following persons were excused or deferred:

### EXCUSED

| NUMBER | REASON | AUTHORITY |
|---|---|---|
| 1 | served on jury within past year | K.S.A. 43-159(b) |
| 51 | age or health | K.S.A. 43-159(a) |
| 4 | students working way through college | K.S.A. 43-159(d) |
| 11 | not reimbursed for jury duty | K.S.A. 43-159(d) |
| 7 | job-related | K.S.A. 43-159(d) |
| 2 | religious beliefs | K.S.A. 43-159(d) |
| 1 | prejudiced (unable to maintain an open mind) | K.S.A. 43-159(d) |
| 10 | no babysitter; run day care | K.S.A. 43-159(d) |
| 1 | Rossville resident without transportation | K.S.A. 43-159(d) |
| 1 | non-citizen | K.S.A. 43-156 |
| 89 | | |

### DEFERRED

| NUMBER | REASON | AUTHORITY |
|---|---|---|
| 29 | job-related | Standard 6(c) |
| 12 | vacation—prepaid tickets | Standard 6(c) |
| 3 | children home, no sitter | Standard 6(c) |
| 1 | subpoena to another court | |
| 1 | getting married | |
| 3 | school-related | |
| 49 | | |

Ms. Young further testified, during cross-examination, concerning the exclusion of certain groups or classifications of people as follows:

"Q. [By Mr. Irigonegaray, assistant prosecutor] Do you, ma'am, systematically exclude any member of our society as a potential juror for jury duty in our county?

"A. No.

"MR. WURTZ [defense counsel]: Your Honor, I object. That's a legal conclusion. She can testify as to what she does, but the 'systematic exclusion' is a legal term of art.

"THE COURT: I don't think it is. Overruled.

"Q. Do you exclude automatically, for example, women?

"A. No.

"Q. Do you exclude, for example, automatically, anyone under the age of 21?

"A. No.

"Q. Anyone over the age of 60?

"A. No.

"Q. Do you exclude Hispanics?

"A. No.

"Q. Do you exclude disabled people?

"A. No.

"Q. Does the county have any policy whatsoever of excluding any segment of our society?

"A. No. There would be one thing as excluding, as if they didn't understand the English language or if they didn't understand that's by statute. So they're automatically excluded.

"Q. Other than the statutory exclusions, do you employ any other exclusions for the exclusion, systematic exclusion of potential jurors?

"A. No."

The age breakdown of the proposed venire which defendant relies upon for his charge that his right to a jury from a fair cross section of the community was violated is as follows:

| AGE | % OF VENIRE |
| --- | --- |
| 60- | 35 |
| 50-59 | 19.4 |
| 40-49 | 16.5 |
| 30-39 | 18.4 |
| 20-29 | 6.8 |
| under 20 | 1 |

Defendant's primary concern about the panel is that the over-age-60 group is overrepresented (35%), while the younger group is underrepresented. Valid exemptions can have this effect. People charged with care of small children are generally in the under 60 category as are persons whose presence at their employment is required for public welfare, health, or safety (policemen, firemen, etc.).

In denying the motion herein, the district court reasoned:

"It may be that this particular panel has a higher percentage of persons over 60 than in some previous panels, but that in and of itself is no showing that it's not a fair cross section of population of this county. There's certainly been no showing that any segment or portion of the population has been systematically excluded from this jury panel.

"As far as the people being excused because of extraordinary or compelling personal hardship is concerned, that is a matter within the province of the Court. I don't think that the parties or counsel have any standing to challenge the Court's excusing of people for that reason. In that connection, I would direct your attention to *State [v.] Folkerts* in 229 Kansas 608. I think the evidence is clear that this panel has been selected in accordance with the state statutes and there's been no violation of any constitutional protection."

In the present case, there has been no showing that any distinctive group has been systematically excluded. The individual situation of the person seeking to be excused was the determining factor—not their age, race, religion, gender, education level, etc. There is absolutely no showing the jury coordinator deviated from the statutes or Supreme Court standards in any significant respect. We find no merit in defendant's contention he was denied a fair cross section of the community in the jurors assigned to appear for the trial of his case.

Next, defendant contends that only a judge could properly excuse a member of a jury panel from service. He acknowledges that no statute imposes such a restriction and cites no authority that such is a constitutional right. Our standards expressly authorize a court to delegate such duties to a "duly authorized court official." Standard 10(c) directs that responsibility for administering the jury system be vested in an administrator acting under supervision of the court. That is exactly the role Ms. Young occupied. She testified that she consulted with the appropriate judge when any problems arose. We find no merit in this point.

For his next point, defendant argues he had a constitutional right to be present in person and by counsel when excuses from jury service and deferrals were determined. This point was not directly presented to the trial court and seems to have crept in on appeal.

Defendant cites no authority for the proposition he has a constitutional right to be so present and represented. He argues that his absence from a portion of the jury selection can never be harmless error. In support thereof, he cites *United States v.*

*Crutcher*, 405 F.2d 239 (2d Cir. 1968), *cert. denied* 394 U.S. 908 (1969). This reliance is misplaced. In *Crutcher*, five men were charged with hijacking a truck. Two pled guilty and two were scheduled for trial with the fifth remaining at large. On the day of trial, the fifth man (Payne) was arrested in another state. The trial court appointed an attorney for Payne and proceeded to impanel the jury, Payne, of course, being absent. Payne was brought into the state after the jury had been selected, but prior to commencement of the evidence. In *Crutcher*, one defendant missed a crucial part of the trial—the selection of the jury.

The concept that a defendant and his counsel must be present when persons receiving summonses for jury duty are requesting to be excused, but prior to when the trial has commenced, is not even feasible. More often than not, one panel serves many cases in different divisions. Often it is uncertain at this stage which cases will actually be tried during their service. Many courts have primary cases set with various back-up cases listed. It would be impossible to bring all defendants and their counsel together to be present when the decision is to be made on a panel member's request to be excused from jury service. Also, such requests are not determined in a group, but on an individual basis. Such request will probably be in the form of a telephone call or note. No authority has been cited for the proposition that this is a stage of the proceeding requiring defendant's attendance in person and by counsel.

We note also that K.S.A. 22-3405(1) provides: "The defendant in a felony case shall be present at the arraignment, at every stage of the trial including the impaneling of the jury . . . ." Assembling the jury panel is not the "impaneling of the jury." As used in this statute, "impaneling of the jury" means jury selection. A criminal defendant's statutory and constitutional rights to be present in person and by counsel at trial do not extend to the determination of excuses from jury service sought by individuals who have received summons for jury duty but have not reported for service on a particular case.

We find no merit in this point.

## ASSISTANT ATTORNEY

For his second issue, defendant contends the use of an assistant attorney exceeded the scope of involvement permitted by K.S.A. 19-717, and, thus, violated his right to a fair trial.

K.S.A. 19-717 provides:

"That the prosecuting witness in any criminal action or proceeding may, at his own expense, employ an attorney or attorneys to assist the county attorney to perform his duties in any criminal action or proceeding under any of the laws of the state of Kansas, and such attorney or attorneys shall be recognized by the county attorney and court as associate counsel in such action or proceeding, and no prosecution shall be dismissed over the objection of such associate counsel until the reason of the county attorney for such dismissal, together with the objections thereto of such associate counsel, shall have been filed in writing, argued by counsel, and fully considered by the court."

Pedro Irigonegaray was hired by the victims' families pursuant to said statute. He served as an assistant prosecutor under K.S.A. 19-717 rather than as a special prosecutor under K.S.A. 1990 Supp. 22-2202(17). In *State v. Berg*, 236 Kan. 562, 694 P.2d 427 (1985), we discussed the difference between a special prosecutor and an attorney hired to assist the prosecutor. We stated, *inter alia*:

"In our opinion an attorney hired by the complaining witness *to assist the prosecutor* pursuant to 19-717 is not a 'special prosecutor' within the meaning of 22-2202(19). Although we find no Kansas cases which define 'special prosecutor,' we are of the opinion that, as used in the statute, it refers to one who is temporarily appointed by the court to replace the absent county attorney pursuant to K.S.A. 19-711 or 19-715. The 19-717 attorney does not take over the role of the prosecutor. The controlling word in 19-717 is 'assist.' The attorney is to assist the prosecutor who will maintain ultimate control of the case.

"In *State v. Wells*, 54 Kan. 161, the Supreme Court held that although it was not error for the lower court to permit private counsel to assist the county attorney, the entire prosecution was to remain under the supervision and control of the county attorney. K.S.A. 19-717 was enacted in 1901, subsequent to the *Wells* case. Since the statute specifies that the attorney employed by the complaining witness 'assists' the prosecutor, the statute codifies the holding in *Wells* and was not meant to override that case. More recently, in *State v. Sandstrom*, 225 Kan. 717, 595 P.2d 324, *cert. denied* 444 U.S. 942 (1979), this court held that it was not error to hire an assistant to the prosecutor under 19-717 since '[t]he district attorney participated fully in the prosecution and there is nothing to show he was not in full control

of the case.' 225 Kan. at 723. See also *State v. Atwood*, 187 Kan. 548, 358 P.2d 726 (1961).

"In discussing 19-717 in [*State ex rel. Rome v. Fountain*, 234 Kan. 943, 678 P.2d 146 (1984)], this court stated:

'This statute does not give to the associate counsel the right to take an appeal to an appellate court from an order dismissing the case. . . .

'. . . Although the complaining witness does have the right to employ private counsel to assist the county attorney, the ultimate prosecution of the case remains at all times in the hands of the public prosecutor.' 234 Kan. at 949.

"The drastic difference in roles between the 'public' prosecutor and the 'private' prosecutor was observed in Note, *Private Prosecution—The Entrenched Anomaly*, 50 N.C.L. Rev. 1171, 1173 (1972):

'From his sole function as procured advocate for a prosecution, the duties of the public prosecutor have taken new dimensions. He is not an advocate in the ordinary sense of the word, but is the people's representative, and his primary duty is not to convict but to see that justice is done. The prosecutor is an officer of the state who should have no private interest in the prosecution and who is charged with seeing that the criminal laws of the state are honestly and impartially administered, unprejudiced by any motives of private gain. It is his duty to show the whole transaction as it was, regardless of whether it tends to establish a defendant's guilt or innocence.

'Conversely, a privately retained attorney owes his client individual allegiance, and once employed he must not act for an interest even slightly adverse to that of his client in the same general matter. Therefore, in view of the ethical and judicial restrictions imposed on the public prosecutor and the generally recognized loyalties of the private advocate, "private prosecutor" is a contradiction in terms. The high standard of impartiality demanded of a prosecutor realistically cannot be expected of the private advocate.' " 236 Kan. at 566-68.

Defendant contends that, in essence, the district attorney turned over the prosecution of this case to Mr. Irigonegaray and abdicated his role as the prosecutor. The record reflects:

1. The district attorney filed the complaint;
2. the district attorney conducted the preliminary hearing although an associate of Mr. Irigonegaray's was present;
3. the district attorney worked out the plea agreement with Lisa Pfannenstiel which led to her testimony against the defendant;
4. the district attorney conducted all of the trial proceedings except those which will be enumerated as having been done by Mr. Irigonegaray.

Mr. Irigonegaray was assigned the following primary duties by the district attorney:

1. voir dire of the jury;
2. direct and redirect examination of Verne Horne (his client);
3. direct and cross-examination of the expert psychiatric expert witnesses relative to defendant's insanity defense;
4. cross-examination of the defense witnesses;
5. the second half of the State's closing argument.

Both the district attorney and Mr. Irigonegaray appeared at the sentencing and expressed their views.

This was a lengthy and complex trial in which the State called over 50 witnesses. We have carefully examined the record and conclude that defendant has failed to establish his claim that Mr. Irigonegaray was "lead" counsel for the State, and that the district attorney had relinquished his responsibilities to the assistant attorney. If so assigned by the district attorney, an assistant under K.S.A. 19-717 may take an active role in the proceedings, and need not confine himself to taking notes and advising the district attorney, which is apparently the role defendant believes is appropriate herein.

Before proceeding to the next issue, some reference needs to be made to a sort of "sidecar" point riding along beside the main point in this issue. Defendant contends that Mr. Irigonegaray acted improperly in connection with a party flier distributed by a family member of the victims (Suzanne James). The party was to be held on a day when the trial was in progress. The flier made references to defendant's insanity defense. Defendant filed a motion prior to trial to remove Mr. Irigonegaray from the case for having leaked confidential psychiatric information on defendant to Ms. James. On hearing, the motion was denied. Defendant characterizes the attorney's behavior in this regard as "reckless and vengeful." This sidecar point is really seeking review of the district court's denial of the motion. The district court held that Mr. Irigonegaray did not disclose the information to Ms. James and, that there was no "gag" order on the data anyway. We have been provided with no basis for overturning the trial court's denial of this pretrial motion.

We conclude that this issue is without merit in its entirety.

## CLOSING ARGUMENT

Defendant next contends that he was denied a fair trial by remarks made by Mr. Irigonegaray in his portion of the closing argument.

The general rules relative to claims of prosecutorial misconduct in closing arguments are as follows. Improper remarks made in closing argument are grounds for reversal only when they are so gross and flagrant as to prejudice the jury against the defendant and deny him a fair trial. *State v. McKessor*, 246 Kan. 1, Syl. ¶ 7, 785 P.2d 1332 (1990). The prosecutor is entitled to considerable latitude in arguing the case to a jury. There is no prejudicial error where the questionable statements of a prosecuting attorney are provoked and made in response to previous arguments or statements of defense counsel. *State v. Hanks*, 236 Kan. 524, Syl. ¶ 7, 694 P.2d 407 (1985). Since Kansas does not follow the "plain error" rule used in federal courts, reversible error cannot be predicated upon a complaint of misconduct of counsel during closing argument where no contemporaneous objection is lodged. *State v. Bird*, 238 Kan. 160, Syl. ¶ 13, 708 P.2d 946 (1985). Remarks made by the prosecutor in closing argument are harmless error if the court finds that the error had little likelihood of changing the result of the trial. *State v. Buckland*, 245 Kan. 132, Syl. ¶ 6, 777 P.2d 745 (1989).

A number of complaints are made relative to this portion of the closing arguments. We will list each.

Mr. Irigonegaray referred to defense counsel's statement during closing argument that the true measure of a society is how it treats those who are sick or poor, to which Mr. Irigonegaray said should be added "how it treats those that are the victims of crime, how it treats those that are buried in our cemeteries." Defense counsel objected. The objection was sustained and the jury was admonished to disregard the comment.

The next complained-of remarks need some additional background material to place them in context. While the defendant was driving the Haleys and Mrs. Horne to Douglas County, Mrs. Horne engaged defendant in conversation. One of the matters he discussed was a prior lawsuit he had been involved in which arose from his being struck by a truck. The point of this line of testimony was to show defendant's state of mind and control of

his faculties and to rebut his insanity defense. Defendant told a police· officer shortly after the accident that he had been chased into the street by a large dog. When he filed the lawsuit against the truck driver, the dog was not mentioned.

In closing argument, Mr. Irigonegaray stated:

"Tyrone Baker is not insane. Tyrone Baker is a criminal, and this nice boy image that you are in fact being advised of by the defense is nonexistent. It's a smoke screen. If in fact this young man is such a wonderful human being, why did he lie under oath when he sued Kent Bigham on the allegation that because the driver of that truck was negligent, he had been struck by the truck? In this lawsuit that he filed, dated on March the 9th, 19—"

Defense counsel objected and was overruled. Then, the following transpired:

"MR. IRIGONEGARAY: On March the 9th, 19 hundred and 89, this good boy files a suit in this courthouse, Division 8, wanting more than $10,000 from the person that ran into him. There is no mention here of any wild dog chasing him whatsoever.

"MR. WURTZ: Your Honor, I've got to object on this. There's no requirement, I don't believe, that it—that that is being alleged in the original petition. It's misleading.

"THE COURT: Well, overruled.

"MR. IRIGONEGARAY: Your Honor, the allegation is and you read this, the only reason for the accident was the negligence of the driver of the vehicle. Read this if you wish and see if you see anything in there where he's—he was being chased and that it was his fault that he ran into that truck as now they try to tell you occurred."

What defendant may or may not have included in his pleadings in the truck case is extremely trivial. Aside from the remarks being neither gross nor flagrant, there is absolutely no basis to conclude they deprived defendant of a fair trial.

The next area of complaint stems from remarks about the gun identified as having killed the Haleys and as having been borrowed by the defendant for his burglary of the Dougherty home.

These remarks are as follows:

"MR. IRIGONEGARAY: This is the murder weapon, Exhibit 5, this is what that man used to take three lives—two of them, excuse me, two lives. And when he was through, with taking those—

"MR. WURTZ: Your Honor, the murder of the Haleys isn't an issue here.

"THE COURT: I'm sorry?

"MR. WURTZ: The murder of the Haleys isn't an issue here.

"MR. IRIGONEGARAY: The murder of the Haleys has been involved in this case from the beginning, Mr. Wurtz.

"THE COURT: Well, I'm aware of that.

"MR. WURTZ: Thank you.

"MR. IRIGONEGARAY: When he took those two lives and he no longer needed this weapon, knowing that he [no] longer needed it, being able to formulate that clear thought in his mind, what did he do with this? He took it to his friend and said, you better get rid of it. This weapon, however, showed up not because he wanted you to see it, but because through a very fortuitous set of events, it ended up in this courtroom. And the ballistics match. There's no doubt that this is the weapon that killed Nancy and Lester Haley, and there's no doubt that this is the weapon that Tyrone Baker obtained for the purpose of burglarizing Ida Mae Dougherty's home."

There was no contemporaneous objection lodged against these remarks, hence reversible error cannot be predicated on these remarks. *State v. Bird*, 238 Kan. 160, Syl. ¶ 13. Even if a contemporaneous objection had been lodged, we would find no reversible error herein. Insanity was the defense herein. The circumstances under which defendant obtained and disposed of the gun were relevant thereto. Additionally, defense counsel had referred to the gun and the circumstances under which defendant had obtained it in his closing argument.

Defendant next complains about the following statements:

"MR. IRIGONEGARAY: May it please the Court, Your Honor, Counsel: Before I commence my rebuttal of Mr. Wurtz's closing argument, I must out of order first address a comment that was made by Mr. Wurtz. No one is more dedicated to the principle of constitutional appearance than I am.

"MR. WURTZ: Objection, Your Honor, personal opinions are improper argument.

"MR. IRIGONEGARAY: You told the jury that we bought a witness.

"THE COURT: Overruled.

"MR. IRIGONEGARAY: No one is more concerned with the rights of the accused than I am.

"MR. WURTZ: Personal comments, Your Honor, objection.

"MR. IRIGONEGARAY: You told us we bought a witness.

"MR. WURTZ: And I believe it.

"MR. IRIGONEGARAY: I believe what I'm saying as well.

"THE COURT: Counsel, that's enough.

"MR. IRIGONEGARAY: No one bought Dr. Modlin. That is simply an untruth. It is false and it is insulting not only to the judicial process, it is insulting to a man who for 50 years has served the psychiatric profession with distinction, honor and ability, and to suggest to you that any amount of money is going to get Dr. Modlin to come into this courtroom and lie

to you is as preposterous, is as ridiculous, it's as insane as to believe that this man did not know what he was doing."

In defense counsel's closing argument, he had discussed Dr. Modlin's testimony and his excellent credentials then implied that the doctor had not done his job on this case. Dr. Modlin was the State's expert witness on the defendant's defense of insanity. In concluding his remarks on Dr. Modlin, defense counsel stated: "What the State did here was buy an opinion."

The complained-of remarks by Mr. Irigonegaray were in direct response to the "buying an opinion" remark. Both attorneys became personal in their discussion of the objection. Defense counsel even added he personally believed the witness had been bought. We find no error in the State's complained-of remarks relative to Dr. Modlin.

Additionally, defendant complained of the following Irigonegaray remarks:

"Tyrone Baker is a criminal, is a criminal who was progressively getting involved in more and more crime. And if we buy their defense that a nice person doesn't kill, then no one would ever be convicted of murder. Because all murderers have to kill once for the first time. He didn't stop there, though. Once he murdered he murdered twice more to cover up the crime. Tyrone Baker is not insane. Tyrone Baker is a criminal, and this nice boy image that you are in fact being advised of by the defense is nonexistent. It's a smoke screen."

Defendant contends this was an innuendo that if not convicted he would kill again. We do not so construe the remarks. However, there was no contemporaneous objection thereto and, accordingly, the remarks could not be the basis for reversible error.

We have reviewed the complained-of remarks in closing argument both individually and collectively and find no reversible error.

## SANITY

For his next issue, defendant challenges the sufficiency of the evidence for the jury to find beyond a reasonable doubt that the defendant was sane at the time of the commission of the offenses herein.

Defendant asserted an insanity defense. In Kansas the test to be applied is the *M'Naghten* test, which we adopted in *State v. Nixon*, 32 Kan. 205, Syl. ¶ 1, 4 Pac. 159 (1884). We have stead-

fastly adhered to that test. *State v. Wood*, 235 Kan. 915, 921, 686 P.2d 128 (1984), and cases cited therein. Under the *M'Nagh-ten* test, the defendant is to be held not criminally responsible (1) where he does not know the nature and quality of his act, or, in the alternative, (2) where he does not know right from wrong with respect to that act. Under the "right and wrong" test of criminal insanity, it must be proved that at the material time the accused did not know that what he was doing was contrary to law. It is not sufficient to prove that he believed that, while what he was doing was legally wrong, it was morally right. *State v. Lawton*, 241 Kan. 140, 143-44, 734 P.2d 1138 (1987). The jury was instructed on the *M'Naghten* test. Defendant was found guilty of first-degree murder, three counts of kidnapping, one count of aggravated burglary, and one count of conspiracy to commit aggravated burglary.

Defendant contends that the evidence was insufficient for the jury to find beyond a reasonable doubt that he was not insane during Ida Mae Dougherty's murder, the burglary of her home, or the kidnapping of Verne Horne and the Haleys.

The rule of appellate review of a claim of insufficient evidence is well established:

"When the sufficiency of evidence is challenged, the standard of review on appeal is whether, after review of all the evidence, viewed in the light most favorable to the prosecution, the appellate court is convinced that a rational factfinder could have found the defendant guilty beyond a reasonable doubt." *State v. William*, 248 Kan. 389, Syl. ¶ 19, 807 P.2d 1292 (1991).

See *State v. Graham*, 247 Kan. 388, Syl. ¶ 5, 799 P.2d 1003 (1990); *State v. White*, 246 Kan. 28, Syl. ¶ 5, 785 P.2d 950 (1990).

Recently in *State v. Pioletti*, 246 Kan. 49, 56-57, 785 P.2d 963 (1990), we discussed the burden of proof in an insanity case. Quoting *State v. Hollis*, 240 Kan. 521, 731 P.2d 260 (1987), we said:

" ' "[T]he state is not required in the first instance to introduce evidence to prove sanity, for the law presumes that all persons are sane, and this presumption of sanity takes the place of evidence in the first instance. It answers for evidence of sanity on the part of the state. But if evidence is introduced which tends to shake this presumption, the jury must then consider the same, and its effect upon the main issue of guilty or not guilty, and if upon considering the whole of the evidence introduced on the trial, together with the presumption of sanity, the presumption of innocence, and

all other legal presumptions applicable to the case under the evidence, there should be a reasonable doubt as to whether the defendant is sane or insane, he must be acquitted. . . . [The defendant] is required only to raise a reasonable doubt as to his guilt. The burden of proof is always upon the state, and never shifts from the state to the defendant." ' 240 Kan. at 529 (quoting *State v. Crawford*, 11 Kan. 32, 44-45 [1873])." 246 Kan. at 56-57.

The only testimony concluding that defendant was insane at the time of the crimes was that of Dr. Gilbert Parks, a psychiatrist who testified for the defense. He concluded that defendant was a paranoid schizophrenic with an avoidance personality disorder and, at the time of the crimes, was possessed or dominated by his psychotic personality, which believed that breaking the law was doing good.

Dr. Parks' testimony, however, was disputed. The State's expert witness, Dr. Herbert Modlin, a psychiatrist, testified that the defendant had schizophrenia, but that he was not insane at the time of the alleged crimes.

In *State v. Sanders*, 225 Kan. 147, Syl. ¶ 4, 587 P.2d 893 (1978), we said:

"The testimony of medical experts that an accused was legally insane at the time of a criminal act is not conclusive merely because it is not disputed by other medical testimony. The testimony of nonexpert witnesses who observed the actions of the accused immediately before, during and after the criminal act may be considered by a jury along with testimony of expert witnesses."

See *State v. Hollis*, 240 Kan. at 532.

There was a great deal of pertinent lay testimony in this case.

Verne Horne, Lisa Pfannenstiel, Chris Miller (the friend who loaned defendant the duct tape), and Kris Miller (defendant's friend who loaned him the gun) all portray defendant as a sane person in control of his faculties who knew what he was doing. His actions in planning the crimes, obtaining necessary equipment, disposing of the bodies, hiding the property taken in the burglary, disposing of the gun, and changing his appearance after the crimes all support the jury's conclusion that the defendant was legally sane at the time of the commission of the offenses.

We are convinced that a rational factfinder could have found beyond a reasonable doubt that the defendant was sane at the time of the commission of the crimes herein.

## CONSPIRACY

Next, defendant contends that the evidence was insufficient to prove that an agreement existed between defendant and Lisa Pfannenstiel to commit aggravated burglary.

In *State v. Rider, Edens & Lemons*, 229 Kan. 394, 404-05, 625 P.2d 425 (1981), we discussed the interpretation and application of the conspiracy statute, K.S.A. 21-3302(1), as follows:

"*State v. Roberts*, 223 Kan. at 52, contains a nutshell summary of the proof required to sustain a conviction on the conspiracy charge, as follows:

" 'Our conspiracy statute provides:

" ' "A conspiracy is an agreement with another person to commit a crime or to assist to commit a crime. No person may be convicted of a conspiracy unless an overt act in furtherance of such conspiracy is alleged and proved to have been committed by him or by a co-conspirator." '(K.S.A. 21-3302[1].)

" 'In *State v. Daugherty*, 221 Kan. 612, 562 P.2d 42, this court holds:

" ' "Conspiracy as defined by K.S.A. 21-3302 consists of two essential elements: (1) An agreement between two or more persons to commit or assist in committing a crime and (2) the commission by one or more of the conspirators of an overt act in furtherance of the object of the conspiracy." ' (Syl. 4.)

" ' To prove a conspiracy it must be established that the conspirators had a mutual understanding or tacit agreement, a meeting of the minds, for the accomplishment of the common purpose. This meeting of the minds may be expressed or implied from the acts of the parties. (15A C.J.S., Conspiracy, § 40, pp. 734-735.) However a conspiracy to commit a crime is not established by mere association or knowledge of acts of the other parties. There must be some intentional participation in the conspiracy with a view to the furtherance of the common design and purpose. (15A C.J.S., Conspiracy, § 39, pp. 733-734.)' "

Lisa Pfannenstiel's testimony establishes that she and the defendant had, if not a mutual understanding, a tacit agreement to commit the crime of aggravated burglary.

Lisa Pfannenstiel was the defendant's girlfriend. On the night of the aggravated burglary, the two were walking around the Westboro neighborhood. The stated purpose was to find a house to break into. Lisa knew defendant had a gun. Defendant decided on Ida Mae's house after the two of them had seen she was at home. They went together to get the duct tape that defendant decided was necessary to lessen the sound of breaking glass. Upon their return, they each saw Ida Mae in the kitchen. The window was taped and then broken. They then entered the premises. The purpose of the burglary was to obtain money in order to

rent a place of their own (defendant and Pfannenstiel were living with friends).

We find no merit in this issue.

## MOTION TO DISMISS

Defendant contends the district court erred in denying his motion to dismiss based upon violation of K.S.A. 22-2302(2).

K.S.A. 22-2302(2) provides:

"Affidavits or sworn testimony in support of the probable cause requirement of this section shall not be made available for examination without a written order of the court, except that such affidavits or testimony when requested shall be made available to the defendant or the defendant's counsel for such disposition as either may desire."

Defendant contends that the prosecution and the court violated the defendant's right to contest the publication to the public of the affidavit filed in support of the complaint.

The complaint and affidavit were filed at 4:19 p.m. on December 7, 1989. Defendant's motion to seal the affidavit filed with the complaint was filed 19 minutes later, at 4:38 p.m. on December 7, 1989. Media representatives apparently gained immediate access to the affidavit.

On January 23, 1990, defendant filed a motion to dismiss for violation of K.S.A. 22-2302(2).

Although it is not in the record before us, Administrative Order Number 205 of the Third Judicial District (adopted in 1985) apparently grants authority to the Clerk of the District Court to release affidavits upon request. The purpose of the rule, as stated by defense counsel, was to relieve parties from having to go to court in order to obtain the release of an affidavit.

In denying the motion, the district court stated:

"I'm going to deny the motion, but I want to say that I agree with Mr. Wurtz. This administrative order effectively eliminates a case-by-case evaluation on the question of whether or not an Affidavit or sworn testimony that's been filed in a criminal case should be released. The rule reverses the legislative proscribed procedure. In other words, a party wishing to prohibit disclosure is forced to carry the burden to prevent release where the statute prohibits release unless it's waived placing the burden on the party desiring to inspect the material to have the burden of proof.

"Now, if the legislature had not wanted to, or if the legislature had wanted all Affidavits and sworn testimony to be public record, they would not have

enacted this statute. Administrative Order Number 205 attempts to make all of these materials public records, per se.

"There's another concern, and I admonish counsel to think about it. I don't think there's anything I can do about it particularly here, but there is a canon of ethics that applies to prosecutors that prohibits them from commenting on statements or confessions of witnesses and the identity of parties or witnesses in a criminal action. Now, here, by virtue of this rule, the District Attorney can effectively circumvent this canon by putting in the Affidavit the same material and filing the statements, and it's wrong.

"I don't have the authority to declare Administrative Order Number 205 void. But I do declare that it—the rule itself was violated by a release before the warrant was served and I think that 205 violates the statute 22-2302. And I don't know what the Appellate Court will do with this. It will be up to them.

"I agree with Mr. Olander that the prejudice does not sufficiently—or does not sufficiently demonstrate prejudice to warrant dismissal of this case, and whether or not the pretrial publicity will prevent a fair trial only remains to be seen after we have attempted to pick a jury. But I think that—I guess what I'm saying is that the way we have apparently been doing things, I'm here to tell you, it's wrong and I think that there's no other reading that you can give 22-2302 but to say what I've already said, that the District Court of Shawnee County has attempted to make that statute work backwards. And it's clearly contrary to the legislative intent, but the motion will have to be denied anyway. We've all had our say on that issue."

The Third Judicial District's Administrative Order No. 205 was contrary to K.S.A. 22-2302(2) and, accordingly, invalid. Defendant contends that because of said violation his convictions should be reversed. He cites no authority in support of such an extreme remedy. Although the record does not so state, presumably the Third Judicial District has amended or repealed the rule so that it is no longer in violation of the statute. If not, the matter should be taken care of.

This case received a great deal of media attention from the date the commission of the crimes herein became known through the preliminary hearing and trial. There is no indication of how the release of the affidavit denied defendant a fair trial. We conclude the error was harmless.

The judgment of the district court is affirmed.

LOCKETT, J., concurring: Occasionally an appellate court reaches inconsistent determinations in different cases. The rarest of all occasions is when an appellate court reaches inconsistent determinations in the same case.

Here, the majority examined the Kansas statutes relative to jury panels (K.S.A. 43-107 *et seq.*) and Kansas Supreme Court Standards Relating to Jury Use and Management (1990 Kan. Ct. R. Annot. 49). The majority decided that a Supreme Court Rule, which allows a district judge to delegate certain statutory duties to a jury coordinator or other designated administrator, is a proper delegation of judicial authority. And later, in the same opinion, it determined that a district court administrative order, which delegates to the Clerk of the District Court the statutory requirement for a written order from a judge before affidavits or sworn testimony in support of the probable cause requirement may be made available, is an improper delegation of judicial authority.

Let us compare the statutes and the court rules:

K.S.A. 43-155 provides:

"The public policy of this state is declared to be that jury service is the solemn obligation of all qualified citizens, and that excuses from the discharge of this responsibility should be granted by the judges of the courts of this state only for reasons of compelling personal hardship or because requiring service would be contrary to the public welfare, health or safety; that all litigants entitled to trial by jury shall have the right to juries selected at random from a fair cross section of the community in the district wherein the court convenes; and that all citizens shall have the opportunity to be considered for service on juries in the district courts of Kansas."

"STANDARD 6: EXEMPTION, EXCUSE, AND DEFERRAL

"(a) All automatic excuses or exemptions from jury service should be eliminated for all persons determined eligible under Standard 4.

"(b) Eligible persons who are summoned may be excused from jury service by a judge or duly authorized court official only if:

  (i) their ability to receive and evaluate information is so impaired that they are unable to perform their duties as jurors,

 (ii) their service would be an extraordinary or compelling personal hardship to them, or to members of the public, or

(iii) they have been called for jury service during the preceding twelve months.

"(c) Requests by eligible persons for deferral of jury service for a reasonable period of time should be liberally permitted by a judge or duly authorized court official to minimize the inconvenience and financial sacrifice of jury service." (1990 Kan. Ct. R. Annot. 51.)

K.S.A. 22-2302(2) provides:

"Affidavits or sworn testimony in support of the probable cause requirement of this section shall not be made available for examination without a

written order of the court, except that such affidavits or testimony when requested shall be made available to the defendant or the defendant's counsel for such disposition as either may desire."

Administrative Order Number 205 of the Third Judicial District (adopted in 1985), apparently grants authority to the Clerk of the District Court to release affidavits upon request.

Each statute imposes a duty on the judge. K.S.A. 43-155 requires a judge to exercise judicial discretion when excusing jurors from their responsibility for reasons of compelling personal hardship or because the required service would be contrary to the public welfare, health, or safety. K.S.A. 22-2302(2) requires a judge to determine if affidavits or sworn testimony in support of probable cause is to be made available.

Judicial duty is the power to exercise judgment and discretion as distinguished from ministerial power involving no discretion. A judge is not a public official who can deputize another person to perform his or her official duties. *Golden v. Mitchell,* 107 Kan. 1, 4, 190 Pac. 785 (1920). A jury coordinator or other designated administrator cannot be deputized to exercise judicial discretion to excuse jurors from their responsibility for compelling personal hardship or where the service would be contrary to the public welfare, health, or safety. Judicial economy may not override the statutory requirements that a judge perform specified duties.

Because no judicial discretion is required, a judge may delegate the ministerial duty of excusing persons statutorily excused from jury duty. A jury coordinator may excuse (1) persons less than eighteen years of age; non-citizens of the United States; and persons who are not residents of the county in which they have been summoned to serve; (2) persons unable to read, write, and understand the English language to such a degree the person does not have the proficiency to fill out a jury questionnaire form prepared by the commissioner; persons under adjudication of incompetency; persons who within the 10 years immediately preceding have been convicted of or pled guilty, or nolo contendere, to a felony (K.S.A. 43-158); and (3) individuals who have served as jurors in the county within 1 year immediately preceding (K.S.A. 43-159).

I agree with the majority's conclusion that the defendant's statutory and constitutional rights to be present in person and by

counsel at trial do not extend to the determination of excuses from jury service sought by individuals who have received summonses for jury duty but have not reported for service on the defendant's case. The defendant is unable to show that the improper delegation of the judicial duty affected his constitutional right to a fair trial. Baker was afforded the opportunity to investigate, question, and have a judicial inquiry to determine if the release of the prospective jurors by the jury coordinator violated a statutory or constitutional right. Baker is not entitled to a new trial on this issue.

ALLEGRUCCI, J., joins the foregoing concurring opinion.